NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

J. H. RUTTER–REX MANUFACTURING
COMPANY, Inc., Respondent.

No. 15690.

United States Court of Appeals
Fifth Circuit.

Feb. 10, 1956.

Victor H. Hess, Jr., Reg. Atty. N.L. R.B., New Orleans, La., Marcel Mallet-Prevost, Asst. Gen. Counsel N.L.R.B., Washington, D. C., Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate General Counsel, Arnold Ordman, William J. Avrutis, Attys. N.L.R.B., Washington, D. C., for petitioner.

Henry J. Read, New Orleans, La., John M. Scott, Fort Worth, Tex., Samuels, Brown, Herman & Scott, Fort Worth, Tex., for respondent.

Before HUTCHESON, Chief Judge, and RIVES and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

The Board seeks enforcement of its order issued against respondent on March 25, 1955, based on findings that respondent, a New Orleans clothing manufacturer, had engaged through its supervisors and managerial officials in unlawful interference, restraint and coercion of its employees, in violation of § 8 (a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1), by means of threats, surveillance, and proscribed interrogation because of their union activity; by exacting of its union affiliates a discriminatory standard of work performance; and by promulgation of a company rule prohibiting employee union activity on company premises during both working and non-working hours. Further violations of § 8(a) (3) and (1) of the Act are predicated upon findings that respondent discharged employees Dolores King, Ida Haynes, and Elizabeth Morgan; and refused to rehire a fourth employee, Clara Dixon, because of their union activities. The Board's decision

and order are reported at 111 N.L.R.B. 1099.

The present controversy was precipitated by a May, 1953, attempt by the union[1] to organize respondent's 600 employees. Three organizational meetings attended by a few of respondent's employees were held at the union's headquarters on June 20, July 11 and July 30th, and on the last date respondent's president, J. H. Rutter, made a speech at the plant to the employees in which he first commented upon employee absences, tardiness, and low production, and then stated in substance that he was aware that the union was making another attempt to organize his employees; that unions only caused strikes and suffering among employees and their families, and he would not tolerate "any damn union in the plant"; that the last time the union had tried to organize his plant he had "personally fired 300 girls", and would fire 400 to 500 more "if necessary"; and that the union had previously "tried to get the Labor Board to make us take back a lot of people whom we had fired and laid off, and the Labor Board itself decided in our favor."[2] In this connection, respondent reasserts the same insistence it urged before the Board and Trial Examiner below, that J. H. Rutter's speech, when considered against the background of respondent's former experience with employee inefficiency supposedly incident to unionization, merely implied that unionization would precipitate such a vast number of employee discharges for justifiable cause, and that the speech was therefore innocuous and non-coercive under the Act. We agree, however, with the Trial Examiner and Board that the language used was neither so intended nor so understood by the employees, but that it was obviously calculated and timed to impress upon them the employment risk and insecurity attendant upon their fur-

---

1. Amalgamated Clothing Workers of America, CIO.

2. This account of the speech is drawn almost entirely from the testimony of union witnesses since J. H. Rutter did not testify.

ther support of the union, and, therefore, clearly within the prohibition of § 8(a) (1) of the Act. N. L. R. B. v. Denton, 5 Cir., 217 F.2d 567, 568–570.

■ During the union organizational campaign, Eugene Rutter, J. H. Rutter's son and the company's vice-president in charge of production, had occasion to observe the subsequently discharged employee, Dolores King, at a small lunchroom near the plant soliciting signatures on union membership cards from two other employees, Floyd Daggs and Robert Smith. Although, according to the credited testimony, he usually ate at a restaurant about a block away, Eugene Rutter afterwards made daily visits to this lunchroom, and on at least two subsequent occasions in late July saw King there engaged during the noon hour in union solicitation activity among the employees. King was discharged on August 5th, the day after Eugene Rutter's last visit to the lunchroom. Considering Eugene Rutter's failure to convince either the Trial Examiner or the Board that his lunchroom visits during the union organizational campaign were neither unusual nor motivated by a desire to ascertain the identity of the union adherents, we think their findings as to his unlawful surveillance from these incidents are not unsupportable as based on that pure "suspicion and conjecture" disapproved by this Court in N. L. R. B. v. Poultry Enterprises, Inc., 207 F.2d 522, but are adequate to support the conclusions as to his unlawful motive, within the rule of such authorities as N. L. R. B. v. East Texas Steel Castings Co., 5 Cir., 211 F.2d 813; and N. L. R. B. v. Collins & Aikman Corp., 4 Cir., 146 F.2d 454.

■ Portions of the credited testimony supporting the other findings of 8 (a) (1) interference and restraint show that during the organizational period Eugene Rutter told employee, Maybelle Johnson, that "I guess you are going to join the union"—"don't get (yourself) into trouble"; that because of "Clara Dixon trying to help organize the union in my plant * * * she'll never come back in here any more"; that Maybelle Johnson should "be smart" and tell him (Rutter) who started the union, because he had fired several other employees "on account of the union"[3] and Maybelle "was going to be next." It was further shown that Eugene Rutter, after notification by the union that twelve of respondent's employees had been appointed on the organizing committee, called each of these employees to his office for individual conferences at which he acknowledged having been informed of their status, questioned several of them about the union and their membership, and warned that "from now on" they would be held to a rigid standard of attendance and production efficiency upon penalty of discharge.[4] Absent discriminatory motivation, we would of course agree with respondent's insistence that it was not required to accord these union protagonists favored treatment because of their committee membership, and in such situation it has the same right to exact from the committee members good faith compliance with attendance and production requirements as it does to require efficiency from its other employees, both union and non-union.[5] But

---

3. Those discharged employees ordered reinstated by the Board, i. e., Dolores King, Ida Haynes, Elizabeth Morgan, and Clara Dixon (not rehired after absence). This finding is vigorously disputed by respondent in connection with the 8(a) (3) discriminatory discharge violations.

4. For example, the Board in brief quotes credited testimony that Eugene Rutter told Lulu Mae Washington (who admittedly had theretofore shown "A-1 attendance, good production, and quality")—

"I want you to be here every day and on time. I want quality * * *. I want production or else * * * you will be fired." Rutter also questioned Lena Lemieux as to her reason for being in "that (Union) mess", and stated that "as long as he and his father owned that place, no union shop would run it."

5. As this Court has many times held, neither union office nor membership, as such, is a guarantee against discharge

respondent's difficulty in seeking exoneration from the 8(a) (1) violations under this rule is that, both the Trial Examiner and Board having found as a fact that his treatment of the committee members was discriminatory, we cannot say upon this record that such finding is without the required evidentiary support, especially when viewed against the background of respondent's proven anti-union animus, the timing and coercive character of Eugene Rutter's interrogations and the threat implicit in his observations to the committee members that greater pressure would be brought to bear upon them "from now on" because of their status as union organizers. Certainly, Rutter's warning against their "organizing on company * * * premises at any time, in the morning, in the evening or lunch time" was proscribed interference and restraint under 8(a) (1) insofar as it prohibited their solicitation on company premises during non-working hours. N. L. R. B. v. LeTourneau Co., 324 U.S. 793, 803–804, 65 S.Ct. 982, 89 L.Ed. 1372; Olin Industries, Inc., Winchester Repeating Arms Co. Division v. N. L. R. B., 5 Cir., 191 F.2d 613, 617.

■ The testimony supporting the findings of respondent's 8(a) (3) and (1) discriminatory discharge violation with respect to employee, Dolores King, shows that she was first employed by respondent in the summer of 1946 and worked intermittently until about 1951, thereafter working continuously until her aforementioned discharge on August 5, 1953; that on July 26 of that year she had joined the union at the behest of her co-worker, Clara Dixon, and by the date of her discharge had successfully solicited signatures of approximately 30 employees to union application cards; that much of King's solicitation took place at the lunchroom near the plant while Eugene Rutter was engaged in the

surveillance of her union activities aforementioned; and that the dispute between King and Rutter which ostensibly precipitated her discharge was over her alleged insubordination in refusing to repair several shirts previously worked on by other employees without being paid extra therefor,[6] and particularly because, according to respondent's testimony, King allegedly used profanity during the incident and threw the shirts at Rutter. The Trial Examiner, while impliedly recognizing that any insubordination or refusal by King to perform her duties would have subjected her to discharge for justifiable cause under the Act, found it unnecessary expressly to resolve the conflicting versions as to the "shirt throwing incident", in view of his conclusion "that *the motivating factor* for King's discharge was her union activity", irrespective of any valid reason for her discharge which may have simultaneously coexisted. See N. L. R. B. v. Whitin Machine Works, 1 Cir., 204 F.2d 883. Ordinarily, we think it the better practice for Trial Examiners more positively to resolve such issues of alleged employee insubordination toward management, in view of the rule that where such valid reason for discharge has been shown, and the Board may as easily infer a lawful as an illegal motive, that substantial evidence required for enforcement of a reinstatement order does not exist. See N. L. R. B. v. Houston Chronicle Pub. Co., 5 Cir., 211 F.2d 848. But we think the Trial Examiner's failure to resolve this issue here was not prejudicial to respondent, for even assuming insubordination on King's part which might have justified her discharge therefor, this record is permeated throughout with such cogent testimony of respondent's antipathy toward the union and threats to discharge its adherents, and contains such strong inferences of Eugene Rutter's discriminatory mo-

---

for justifiable cause under the Act. See N.L.R.B. v. Huber & Huber Motor Express, Inc., 5 Cir., 223 F.2d 748, 749.

6. It was shown that respondent had formerly paid extra for such work in recog-

nition of the fact that it interfered with an employee's production time and chance to qualify for a bonus by meeting her production quota.

tivation in terminating King's employment shortly after his lunchroom surveillance of her union solicitation activity,[7] that we do not think either the Trial Examiner or the Board could as easily have inferred lawful motivation. In any event, we cannot lightly reject as lacking in the requisite evidentiary support their concurrent findings that "the motivating factor" for Eugene Rutter's discharge of King was her active support of the union. See N. L. R. B. v. C. & J. Camp, Inc., 5 Cir., 216 F.2d 113, 115.

Ida Haynes and Elizabeth Morgan were discharged on July 31, 1953, the day after J. H. Rutter's coercive speech, assertedly for being tardy in reporting at their machines for work, but actually, according to the Trial Examiner and Board, because of their active solicitation on behalf of the union. Both employees had apparently served respondent satisfactorily for several years prior to the present attempt to organize its plant, Haynes having been employed since 1947 and Morgan since 1946. Both had joined the union during its July organizational drive, attended meetings and solicited union memberships from other employees. Furthermore, accepting the credited testimony below, both employees were only slightly late on the morning of their discharge, Haynes reaching her machine about two minutes after the 8 o'clock buzzer sounded, and Morgan being at that instant only about 100 feet from her place of work. There is further testimony that other employees were late that same morning but were not discharged or even disciplined. Both Haynes and Morgan protested Rutter's asserted reason for their discharge as "too thin" and later that afternoon inferentially accused him of discharging them because of the union, which Rutter denied. In any event, Haynes was subsequently re-employed by respondent on August 31, 1953, and worked regularly thereafter, but Morgan, who had undergone surgery during the period since her discharge, requested sick leave. Eugene Rutter acknowledged her request on September 3, and inquired as to when she would be able to return to work, in answer to which inquiry Morgan forwarded her doctor's statement that she should be able to return in about three months. On January 6, 1954, after she had been discharged from her doctor's care, Morgan sought reinstatement through telephone calls to Rutter and filing of an employment application, but without success. Respondent insists that it rightfully denied her re-employment because of her previously mentioned dereliction in being late for work, and also because the temporary work for which Morgan expressed preference in her application was not available. Morgan testified, however, that during the course of her conversation with Rutter concerning the possibility of her obtaining re-employment, he mentioned having seen her at the Board hearing on the union's petition for certification and she admitted her presence there on that occasion. In addition, respondent made no showing that it had offered Morgan re-employment in any of the various kinds of jobs in which she had had training and experience, even though respondent was shown to have had a constant turnover in personnel during this period. See Phelps-Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271; N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 130 F.2d 765, 768. From all of the above summarized testimony, we conclude that the finding of both the Trial Examiner and the Board as to respondent's discriminatory discharge of Haynes and Morgan on July 31, and discriminatory refusal to reinstate Morgan on January 6, 1954, in violation of § 8(a) (3) and (1) of the Act, are supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

7. Irrespective of the hotly contested finding as to Eugene Rutter's admission to Maybelle Johnson that he had fired King and the others "on account of the Union".

Finally, that portion of the testimony relating to respondent's discriminatory refusal to re-employ Clara Dixon shows, in part, that Dixon had been employed "off and on" by respondent for seven years; that she had very actively promoted the union's organizational campaign from its inception in May, 1953, attended meetings, and solicited approximately 60 union memberships; that with respondent's permission she was absent from work from June 11 to July 13, to supervise repairs to her home which had been partially destroyed by fire; that during evenings while away from work Dixon solicited union memberships at the homes of other employees; that on June 18, without notification to Dixon, Eugene Rutter made an entry on her employment card that she had quit work voluntarily, and noted, "Do not rehire"; that Rutter also told a plant supervisor, Bellou, during this period that Dixon "wouldn't be back"; that Dixon notified respondent's office as required by Company rules that she would be unable to report for work as previously stated, to which notice Eugene Rutter failed to reply; and that Dixon was denied re-employment on and after July 27th on the ground that no work was available for her. It was further shown that Supervisor Bellou told Dixon during one of her telephone calls regarding re-employment that "she had heard" Dixon already had a job "selling something" (inferably union memberships) from house to house, and that with an "easy job" like that Dixon "wouldn't want to come back to the plant"; that Dixon filed a written application for employment on September 3rd, and was subsequently asked by Eugene Rutter during one of her telephone calls why she "had pressed charges against him at the Board", and about a month later, according to Dixon's testimony, was told to "get up and get out" of the plant office. In view of the above and other testimony, we think the Trial Examiner and Board were justified in rejecting respondent's defenses that Dixon was justifiably refused employment after her extended absence because no work was available and for her failure to file a timely written application, and that they reasonably concluded she was discriminatorily denied the opportunity to resume her work because of her union activity, in violation of 8(a) (3) and (1) of the Act. Universal Camera Corp. case, supra.

It follows that the order of the Board must be enforced in its entirety.

Order enforced.