NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 1423, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL, Respondent.

No. 15959.

United States Court of Appeals Fifth Circuit.

Dec. 21, 1956.

3. Except possibly in some fiduciary capacity. See Estate of Girard, Pa., 127 A.2d 287.

Samuel M. Singer, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, David P. Findling, Associate Gen. Counsel, Theophil C. Kammholz, Gen. Counsel, William J. Avrutis, Atty., N. L. R. B., Washington, D. C., for petitioner.

L. N. D. Wells, Jr., Dallas, Tex., Francis X. Ward, Indianapolis, Ind., Mullinax & Wells, Dallas, Tex., for respondent.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

RIVES, Circuit Judge.

The Board petitions for enforcement of its order issued on January 14, 1955, based upon findings that respondent, the Corpus Christi, Texas, Local of the Brotherhood, in refusing to clear for employment three workers hired by the Columbus Show Case Company, and by threatening to call a strike if the Company used such workers in preference to other union members with greater priority for available work assignment under the union's "first in—first out" rule, had restrained or coerced employees in

the exercise of rights guaranteed in Section 7 of the Act in violation of Section 8(b) (1) (A),[1] and had caused and attempted to cause the Company to discriminate against employees in violation of Sections 8(b) (2) of the Act.[2] The Board's decision and order are reported in 111 N.L.R.B. 206.[3]

During the latter part of 1952, Columbus Show Case Company was under contract with the Fedway Stores Corporation to install fixtures in the Corporation's Wichita Falls and Corpus Christi, Texas stores. To complete the Wichita Falls job, the Company in the early part of September, 1952, hired Millard Glass, James Adams, Jr. and Dewey Hale, each of whom were carpenters and members in good standing of the Wichita Falls local of the parent Brotherhood. At the completion of that work, the Company representatives determined that the job at Corpus Christi, from 400 to 500 miles distant, could be completed with greater dispatch and less expense if enough of the Wichita Falls crew which had become experienced with the type installation there contemplated could be used. After some discussion, these three employees, and a fourth carpenter named Young, agreed to make the trip to Corpus Christi. Glass explained to the Company's representatives in their behalf that, because of the necessity of their obtaining clearance from the Corpus Christi local, they could not possibly report for work before the Monday following completion of the Wichita Falls work on Friday, September 26. In fact, Glass would not agree to report until Tuesday morning, though Adams stated that he would arrive on Monday,—to all of which the Company officials agreed.

On the following Monday morning, September 29, Adams, and Young[4] reported for work at the Corpus Christi job-site, and were directed first to the office of respondent for clearance. Respondent's business agent, W. C. Echols, agreed to nominally clear them for employment, but stated that their names would be placed at the bottom of the list of all local carpenters desiring employment, which would prevent their working on the Fedway job. Echols also warned them that, if they tried to work on the Fedway installation ahead of other local carpenters with greater priority, respondent would pull all the union men off the job, as the men could always "go fishing". Finally, Echols threatened to fine them $50 each for soliciting work if he heard of them even entering the store building. Despite subsequent protests by the Company's representatives, who were informed of respondent's position throughout it would not recede from its insistence that Adams and Young could not obtain clearance for the Fedway employment.

The other two employees here involved, Glass and Hale, reported for work on the Corpus Christi job-site the next morning, Tuesday, September 30, only

1. "(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein * * *." 29 U.S.C.A. § 158(b) (1) (A).

2. "(b) It shall be an unfair labor practice for a labor organization or its agents—

*  *  *  *  *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership * * *." 29 U.S. C.A. § 158(b) (2).

3. The Board's order was originally issued against both the union and the Company, but because the Company has not resisted enforcement the Board here seeks compliance from the union alone.

4. While this carpenter was involved in the dispute, no charge was filed in his individual behalf and the Board's order grants him no relief. Consequently, his status is not in issue upon this review.

to experience similar frustration from enforcement of respondent's "first in—first out" work assignment rule. After some discussion of their joint predicament with Adams and Young, they also attempted to obtain employment clearance at respondent's office, but one Gerald Perry there reiterated to Glass respondent's previously stated insistence [5] that such outside carpenters would have to clear in at the bottom of the employment "waiting list".[6] Glass protested vigorously, insisting that the union's position infringed his right to work upon a job already obtained, and even intimated his view as to the illegality of such action under the Taft Hartley Act. Perry, however, merely restated the union strike threat for any attempted circumvention of its work assignment policy, and implied that Glass, as a union member, could not afford to bring charges against respondent under the Act. Hale, after hearing Perry's remarks to Glass, did not attempt to obtain clearance, or to have his name placed upon the union "waiting list", feeling that to do so would be futile. As in the case of Adams and Young the Company was sympathetic toward the problem, but its apprehension that respondent might carry out the threat of strike reprisal prevented it from using any of the carpenters on the job.[7] Subsequent protests by Glass and Adams through another union official, Sorenson, proved fruitless, so that later that same day all three carpenters left town without having been permitted to work at all on the Corpus Christi employment for which they had traveled several hundred miles.

## I. The Board's Jurisdiction.

Respondent first challenges the Board's jurisdiction in reliance upon the Tenth Circuit's decision in N. L. R. B. v. Shawnee Milling Co., 184 F.2d 57, 23 A. L.R.2d 886, upon the theory that the Corpus Christi job was a separate and distinct intrastate operation with no cognizable impact upon interstate commerce.[8] Without either approving or disapproving the rationale of the Shawnee Milling Co. Case, supra, we think that holding is not applicable where, as here, the employer activity causing the dispute was not a separate and independent intrastate facility of the same employer's overall interstate enterprises, but was an integral part of such employer's predominantly interstate operation. See N. L. R. B. v. Dallas City Packing Co., 5 Cir., 230 F.2d 708, 711; N. L. R. B. v. Reed, 9 Cir., 206 F.2d 184, 187.

---

5. The Board found that Perry had apparent authority to speak for respondent, and that finding is not here contested even though Perry's official position with respondent is not clear from the record.

6. As previously admitted by Echols to Adams and Young the day before, this "waiting list" included rough framers, roofers, deckers, and apprentice carpenters, regardless of whether they had journeyman carpenter status, or any previous experience in the installation of the expensive type store fixtures contemplated by the Corpus Christi installation.

7. That the Company representatives were actually forewarned of the union's strike threat for any attempted circumvention of its "first in—first out" work rule, and made its employment offer conditional upon the carpenters' obtaining union clearance, is evident from the proof, especially the testimony of Glass.
   See, however, N. L. R. B. v. Radio Officers' Union, 2 Cir., 196 F.2d 960, 965,

affirmed 347 U.S. 17, 74 S.Ct. 323, 98 L. Ed. 455, holding that, where the result of the employer discrimination caused by the union tended to encourage union membership, "no threats or promises to the company were necessary."

8. The trial examiner made a contrary finding, with tacit Board approval, that the Company, an Ohio corporation engaged in the installation of store fixtures, made interstate purchases and sales for the year preceding the filing of the charges exceeding $750,000.00 in value, from which he concluded that the Company was engaged in interstate commerce within the meaning of the Act. In sustaining this finding, the Board's only jurisdictional comment was "that the Employer's total business in the sale and installation of store fixtures, and not the value of the Corpus Christi installation alone, determines whether the Employer is engaged in interstate commerce."

## II. The Section 10(b) Limitation Issue.

Respondent next insists that, under the six months' limitation proviso of Section 10(b) of the Act,[9] all charges should have been filed and served by March 30, 1953; that the original charge against it was timely filed only as to Glass on February 26, 1953, and specifically alleged discrimination "on or about October 2, 1952", while the amended charge filed on March 30, 1953 and purporting to include both Hale and Adams as original discriminatees, claimed discrimination "on or about September 29, 1952", and was not served until March 31, 1953, one day after expiration of the six months' limitation period, so that it was ineffective to suspend the running of the Section 10(b) limitation as to Hale and Adams. Like the Board, however, we think that the Section 10(b) proviso does not invalidate the Board's back pay order as to them, for the amended charge contained averments of the same type discrimination originally alleged, resulted from the same employer activity and union policy complained of, and was closely enough related in point of time to the discrimination originally charged to warn respondent of the necessity of preserving any available evidence concerning the dispute. See N. L. R. B. v. United States Gypsum Co., 5 Cir., 206 F. 2d 410, 412; N. L. R. B. v. Talladega Cotton Factory, 5 Cir., 213 F.2d 209, 215, 40 A.L.R.2d 404; cf. N. L. R. B. v. I. B. S. Manufacturing Co., 5 Cir., 210 F.2d 634–637. Like the trial examiner, we find no sound basis in respondent's suggested distinction for limitation purposes between charges filed by a union and those filed by an individual without express authorization, for the issuance of a complaint, based on subsequent and related charges included by amendment, is well within the Board's statutory discretion after investigation and exists unaffected by any individual's lack of authority to prefer charges on behalf of others.

## III. Validity of the Board's back pay order under Section 10(c) of the Act, absent any requirement of reinstatement.

29 U.S.C.A. § 160(c) provides "that where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him." Respondent insists that this statutory language must logically be interpreted to require reinstatement as a statutory condition precedent to the Board's authority to compel a back pay award even where, as here, a back pay order remains the only effective relief available to redress the employee discrimination because the job over which the dispute arose has been completed. True, a literal reading of the statute warrants, though it does not compel, respondent's suggested construction. It seems to us, however, that respondent's argument is foreclosed by the decision in Radio Officers Union of Commercial Telegraphers Union v. National Labor Relations Board, 347 U.S. 17, 54, 74 S.Ct. 323, 98 L.Ed. 455.

## IV. The Merits.

On the merits, respondent insists that the Act preserves a union's right to prescribe its own working rules;[10] and that its adoption of "FIFO"—i.e., its "first in—first out" work rule—was in reasonable furtherance of its internal policy to insure an equitable division of available employment among union members, as well as a necessary disciplinary measure to combat the evil of possible member "kick backs" which might otherwise be granted to employers to obtain jobs. Respondent further insists that, in enforcing such rule, it did not restrain or

---

**9.** In pertinent part:

"*Provided,* That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *." 29 U.S.C.A. § 160(b).

**10.** Viz., Section 8(b) (1) (A), 29 U.S.C.A. § 158(b) (1) (A), *quoted in* Footnote (1), *supra.*

coerce employees in violation of Section 8(b) (1) (A), nor "cause or attempt to cause" any employer discrimination within the ban of Section 8(b) (2) of the Act, since each of the three carpenters involved was admittedly offered the opportunity to clear for eventual Corpus Christi employment,[11] and their failure to do so and consequent forfeiture of their right to work on the Fedway job was attributable to their own voluntary relinquishment of the proposed employment for their inability to comply with their own self-imposed condition of union clearance, and to their desire to retain their status as union members, rather than to enforcement of the "FIFO" rule against them. For reasons hereafter stated, however, we reject each of these arguments as unsound.

While Section 8(b) (1) (A) preserves a union's right to prescribe reasonable rules and policies with respect "to the acquisition or retention of membership", it does not sanction enforcement of such rules through threat of strike reprisal against a recalcitrant employer, so as to inhibit the statutorily guaranteed rights of employees. See N. L. R. B. v. Philadelphia Iron Works, 3 Cir., 211 F.2d 937, 940. We think the Supreme Court made this principle clear in its consideration of a somewhat analogous factual situation in the Radio Officers' Union case, supra, where, after acknowledging that the union's purpose in causing the proscribed employer discrimination was "to encourage [union] members to perform

obligations or *supposed* obligations of membership", it held that such coercion to enforce an employer's acceptance of "the union's desired hiring practices deprived Fowler of a protected right." 347 U.S. at pages 42, 52, 74 S.Ct. at pages 337, 342. Since the proof here shows that respondent threatened the Company with a strike if it employed any of the three workers after respondent had denied them clearance because of its "FIFO" rule, and that the Company subsequently refused, because of respondent's strike threat, to permit the three carpenters to work unless and until they could secure union clearance, we conclude that respondent did restrain or coerce the employees in violation of Section 8(b) (1) (A) and did "cause or attempt to cause an employer to discriminate" against them in violation of Section 8(b) (2) of the Act. Radio Officers' Union v. National Labor Relations Board, supra; N. L. R. B. v. Philadelphia Iron Works, supra; N. L. R. B. v. Daboll, 9 Cir., 216 F.2d 143, 145; cf. N. L. R. B. v. George D. Auchter Co., 5 Cir., 209 F.2d 273.[12]

Finally, we also reject respondent's insistence that the trial examiner and Board improperly placed upon it the burden of disproving the discrimination alleged. The remarks complained of, considered in context,[13] were clearly referable to the appropriate inferences to be drawn in ruling upon the respondent's motion to dismiss for insufficiency of the

---

11. That is, they were granted the opportunity to "clear in" at the bottom of the union "waiting list".

12. Of course, we agree that the validity of the Board's finding of such violation is not necessarily dependent upon the existence of any formal agreement between a union and an employer unlawfully restricting employment to those granted prior union clearance as was involved in this Court's decision in the Auchter Case, supra. Where, as here, the record supports the finding that the employer made his offer conditional upon prior union clearance at the union's behest, the prohibited discrimination exists.

13. "Where neither Respondent adduced any testimony to controvert that of the General Counsel's witnesses, but based their final motions to dismiss solely on General Counsel's proof, I must accept as true and consider all facts proven by the uncontradicted testimony of General Counsel's witnesses, together with all reasonable and legitimate inferences therefrom; and *where the testimony permits of conflicting inferences, those most favorable to the General Counsel's case must be drawn."* (The italicized words are the basis of the complaint.)

838

General Counsel's proof, and as so applied were correct.[14]

The Board's findings being supported by substantial evidence on the record considered as a whole,[15] its order is

Enforced.

**14.** Sandidge v. Atchison, T. & S. F. Ry. Co., 9 Cir., 193 F. 867, 874; Chadwick v. Stokes, 3 Cir., 162 F.2d 132, 133, 172 A.L.R. 405; 53 Am.Jur., Trial, § 314.

**15.** Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.