NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

FANT MILLING COMPANY, Respondent.

No. 16953.

United States Court of Appeals Fifth Circuit.

Aug. 1, 1958.

---

Jerome D. Fenton, General Counsel, Thomas J. McDermott, and Stephen Leonard, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Frederick U. Reel, and Maurice Alexander, Attys. N. L. R. B., Washington, D. C., for petitioner.

O. B. Fisher, J. D. McLaughlin, Gillespie & Gillespie, Sherman, Tex., Fisher, McLaughlin & Harrison, Paris, Tex., for respondent.

Before HUTCHESON, Chief Judge, and RIVES and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

The question presented by Petitioner's prayer for enforcement of its order of April 19, 1957 is whether the Respondent, pursuant to its duty as imposed by National Labor Relations Act,[1] bargained in good faith with respect to the matters contained in the charge filed against it by its certified Union. Respondent, Fant Milling Company, was, during the period involved, engaged in the business of milling flour at Sherman, Texas, and employed about two hundred people. Pursuant to an election, American Federation of Grain Millers, AFL, was certified June 26, 1953 as the exclusive bargaining agent for its employees.

From August 13, 1953 to November 19, 1954 Respondent and the Union met on nineteen different occasions in which discussions were held directed towards working out a contract between the parties.[2] The meetings between the parties were conducted by the local officers and attorneys of the Company, on the one side, and two national representatives of the Union from Oklahoma and a local committee of three to six employees, on the other. No contract having been agreed upon, Respondent, having concluded that the Union no longer represented a majority of its employees, on October 7, 1954 granted a general wage increase to its employees after discussion with the Union representatives but without specific notice to them; and, on November 19, 1954, it posted a notice that it was informed that the Union no longer represented the majority of employees and that it would not do business further with the Union, but would deal directly with its employees.

The Union had, many months prior thereto, filed a charge of unfair labor practices against Respondent upon which, fifteen months later, a complaint was issued; and a hearing was held before a Trial Examiner, who entered his intermediate report finding Respondent guilty of failure to bargain in good faith, and recommending that a cease and desist order be entered. The Board, one member dissenting,[3] adopted the Trial Examiner's report and entered the order which it is seeking to have us enforce.

The question before us will be resolved largely upon a determination of the effect of evidence as to what transpired long after the charge was filed, and as to negotiations and actions of the

1. 29 U.S.C.A. § 151 et seq.

2. These meetings were held August 13, September 5 and 26, November 12, and December 9, 1953; and January 8 and 29, April 2, 8, 19 and 22, May 6 and 21, June 11, July 16 and 30, August 27, September 17, October 15, and November 19, 1954.

3. 117 N.L.R.B. 1277.

parties not embraced in or contemplated by the charge.[4] The Trial Examiner and the Board predicated their orders essentially on the withdrawal of union recognition, one step in which process was the wage increase of October, 1954. The

4. Respondent urges that the Board's finding was not based upon substantial evidence. The Trial Examiner, after noting that the parties had settled upon a good many minor matters, stated: "It seems almost inconceivable that company representatives could sit down over the long period of time with Union representatives as they did here and not be considered to have been bargaining in good faith." The challenge of this statement and the impressions made upon us by the oral arguments stimulated us to read this long record rather than to rely upon the appendices. At the outset, one is struck with the fact that the Company pitted two "local boys," unskilled in such matters, against two experts who made the negotiation of contracts their life's work; and with the fact that the Company shackled its representatives at the outset by requiring the statement to be made that certain areas of agreement would never be included in a contract. Under N.L.R.B. v. Denton, 5 Cir., 1954, 217 F.2d 567, and N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., 5 Cir., 1956, 229 F.2d 816, this alone would tend to cast suspicion from the start upon the Company's negotiations.

The Regional Director first turned down the Union's charges, and there is not in the record more than a hint of anything improper until after October 1, more than a year after the negotiations had been begun.

Both sides proved themselves hard traders, but neither the Trial Examiner nor the Board is able to point out anything smacking of the shrewd and sinister scheming and action necessarily included in the deliberate adoption of a course of negotiations as a mere pretense.

The final action disowning the Union and granting the wage increase, which the Company claimed was necessary to hold its workers against the overtures of its competitors, tend naturally to arouse suspicions and to entice reliance upon the specious doctrine *post hoc ergo propter hoc*. But we have said that "It is necessary that the courts make it clear" that the finding of the Board must be based "upon clear proof derived from evidence and not from suspicion and conjecture * * *". See, infra, N.L.R.B. v. I.B.S. Mfg. Co., 210 F.2d 634, at page 638.

dissenting member has set forth succinctly his estimate of the attitude of the majority and the basis of its decision, and we quote in the margin some excerpts from his dissent.[5] We agree with the estimate and the conclusions as set

But it is not necessary for us to sustain this contention of Respondent because the other points fully discussed in the opinion clearly require that we deny enforcement.

5. "A reading of their [the majority's] opinion shows that the *crucial element in their evaluation of the course of the Respondent's conduct is the wage increase which the Respondent gave its employees in October, 1954. Thus their opinion is almost entirely devoted to a consideration of that wage increase, and they have candidly admitted that the Respondent's granting of the wage increase has given them a 'final insight' into the Respondent's conduct of negotiations with the Union.* My colleagues' decision appears therefore to *affirm the Regional Director's decision not to issue a complaint on the basis of his evaluation of the Respondent's conduct preceding the October 1954 wage increase.* And I, too, agree that but for the wage increase there would be no case whatever against the Respondent. But *as this case turns on the wage increase, the critical issue is whether the wage increase—which occurred after the Union filed its charge, and which was not made the subject of a second, or amended, charge—may lawfully be made the basis of a finding that the Respondent violated the Act.* In my opinion, it may not.

\* \* \* \* \*

"The Courts of Appeals for the Seventh and Fifth Circuits have held respectively, in the Indiana Metals [Indiana Metals Products Corp. v. N.L.R.B., 7 Cir., 1953, 202 F.2d 613] and Newton [N.L.R.B. v. Newton, 5 Cir., 1954, 214 F. 2d 472, 475] cases, that Section 10(b) precludes the finding of an unfair labor practice predicated on acts that occurred subsequent to the filing and serving of a first charge and more than 6 months prior to the filing and serving of an amended charge, even though the acts in question were similar to those alleged in the charges. * * *

"In the instant case, *the Respondent's October 1954 wage increase occurred about 5½ months after the charge was filed, and almost 10 months before the complaint issued.* The October wage

forth in the quoted portions of this dissent.

An understanding of the significant facts with which we are dealing requires that a few decisive dates be kept in mind. May 20, 1954, the Union filed its charge of unfair labor practices, naming November 21, 1953 as the date of their beginning (in recognition of the 6 months period provided in the statute). At the time the charge was filed, eleven bargaining sessions had been held and a wage increase had been given certain employees effective April 19. July 13, the Regional Director refused to issue a complaint based upon this charge, and July 31 the Union filed a written request for review of this refusal, which the dissenting member treated as an appeal to the General Counsel. November 20, the Company posted a notice withdrawing its recognition of the Union as bargaining agent, preceded by the general wage increase of October 7. January 24, 1955, the Regional Director withdrew his refusal to issue the complaint and followed this action with the issuance of a complaint August 17, 1955. Eight bargaining sessions had been held between the date of the filing of the charge and the date of the issuance of the complaint.

The charge signed by Ralph Cox, international representative for the Union, was made out on a printed form and we quote in the margin the contents of the charge under the printed heading "Basis of the Charge." [6] The complaint, issued about fifteen months thereafter and based on the charge of May 20, begins with the statement: "It having been charged by American Federation of Grain Millers * * * that Respondent has engaged in and is now engaging in certain unfair labor practices * * * the General Counsel * * * hereby alleges as follows." [7] Both the complaint and the notice of hearing referred to the charge of May 20, 1954, and a copy of that charge was therewith served upon Respondent.

increase—*which according to the majority is the nub of the case* against the Respondent—was never made the subject of a second or amended charge. Accordingly, even if the complaint herein be regarded as a substitute for such a second or amended charge, the Board is, by virtue of Section 10(b), and under the holdings of the Indiana Metals and Newton cases, *precluded from predicating a violation of the Act on the basis of that October wage increase.* This conclusion is impelled by the language of Section 10(b) for, as the Court said in the Newton case, *'Without the limitation, we have placed on Section 10(b) of the Act, its provisions would be rendered meaningless to a great extent.'* "[Emphasis added.]

6. "On or about November 20, 1953, it, by its officers, agents and employees, refused to bargain collectively with the authorized agents of American Federation of Grain Millers, AFL, chosen by a majority of its employees at its plant to represent them for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment.

"On or about the dates set opposite their respective names below, it, by its officers, agents and employees, terminated the employment of: Tony Polk April 23, 1954 Clyde Gordon April 23, 1954 W. M. Morris April 24, 1954 Onnie Ray April 24, 1954 because of their membership and activities in behalf of American Federation of Grain Millers, AFL, a labor organization, and at all times since such dates it has refused and does now refuse to employ the above named employees.

"By the acts set forth in the paragraphs above, and by other acts and conduct, it, by its officers, agents and employees, interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act."

7. "8. On or about November 21, 1953, and at all times thereafter, Respondent did refuse and continues to refuse to bargain collectively with the Union as the exclusive representative of all the employees in the unit described above in paragraph 5.

"9. On or about October 7, 1954, Respondent, without notice to the Union, put into effect a general wage increase for all employees in the unit described above in paragraph 5.

"By the acts described in paragraphs 8 and 9, Respondent did engage in and is thereby engaging in an unfair labor practice within the meaning of section 8(a), subsection (5) of the Act."

In summary, therefore, the determinant facts are these: May 20, 1954, the Union filed a charge of unfair labor practices based upon Respondent's actions during the six months preceding that date. The Regional Director refused to file a complaint based upon that charge and those actions. Fifteen months after the charge had been filed, the Regional Director issued and served the complaint before us purporting to be based upon it, but setting up, as the only factual recital of an unfair labor practice, a wage increase granted $4\frac{1}{2}$ months after the filing of the charge. Based upon this wage increase of October 7 and the ensuing withdrawal of recognition of the Union, the Trial Examiner and the Labor Board concluded that Respondent had failed to bargain in good faith with the Union. It is perfectly plain, as set out in the dissenting member's language quoted *supra*, that, without these happenings more than four months after the filing of the charge, the order before us would not have been entered—in fact, the complaint would not have been issued.

We think the order was not justified by, but was in plain disregard of, the statute which alone vested the Board with authority to act:

"Whenever it is charged that any person *has engaged in or is engaged in any such unfair labor practice*, the Board * * * shall have power to issue and cause to be served upon such person a *complaint stating the charges in that respect*, and containing a notice of hearing before the Board * * *: Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * * Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. * * *" [Emphasis added.] 29 U.S.C.A. § 160(b).

Since the authority of the Board derives solely from the statute, it is clear that effective action can be taken only when the machinery set up by the statute is substantially followed. It is further clear that a charge must set up *facts* showing an unfair labor practice as defined in 29 U.S.C.A. § 158, and the *facts must be predicated on actions which have already been taken*. When the Board is satisfied that the facts contained in the charge have been substantiated, it or its agents then have power to issue and serve upon the person charged with the improper action "a complaint stating the charges in that respect." This language can have no meaning except that the complaint must faithfully reflect the facts constituting the unfair labor practices as presented in the charge.

Assuming that another charge could have been filed embracing the happenings of October and November, 1954, or the original charge amended to include them, it was not proper for the Board to proceed on the basis of the charge of May 20, 1954 and enter the order here before us bottomed upon actions taken more than four months later.[8] That this is what it did is exemplified by what the Board said was the issue it was trying: "The issue before us is whether the Respondent, in this long course of dealing with the Union, fulfilled its duty to negotiate in good faith so as to justify its refusal in November 1954 to prolong the discussion of collective bargaining issues, or whether on the other hand it evaded its legal duty and was thus without warrant in November 1954 and thereafter for refusing to meet with the Union." Substantially eight of the eleven pages constituting its decision are devoted to a discussion of what transpired in September, October and November.[9] If the

---

8. Respondent, by timely motions and continuing objections, tried without success to limit the decisive period to the six months covered by the charge.

9. The Trial Examiner also devoted the greater part of his report and findings to a discussion of the company's right to break off negotiations with the union.

Board could thus adjudicate the rights of the parties on such subsequent actions which as far as the record reveals, developed from the later stages of the negotiations, using the period covered by the charge merely as background, the statutory scheme would be frustrated and the charge, which alone conferred jurisdiction, would serve only as the trigger to set the mechanism in motion, leaving the Board and its agent *carte blanche* to expand the charge as they might please, or to ignore it altogether.

The Board predicated its authority to try the charge on the issues thus defined by it, on our case of N.L.R.B. v. Anchor Rome Mills, Inc., 1956, 228 F.2d 775. We do not agree that the cases are apposite. Anchor involved refusal of the employer to hire and keep 346 named persons who had engaged in a strike against it. Two charges were filed by the union, one in November, 1949, and the other in May, 1950, and both were couched in very broad terms. The complaint filed by the General Counsel averred that, at all times since the first date charged, Anchor had refused to employ the named persons because of their activity on behalf of the union and because they had engaged in the strike.

The Board relied upon our quotation there from a decision of the Seventh Circuit in N.L.R.B. v. Kohler Co., 1955, 220 F.2d 3, 8, that "The six month limitation refers only to acts that occur before the charge and does not prohibit the inclusion of similar or related acts happening after the charge." [10] The similar and related acts there referred to consisted of mere repetitions of applications by the former employees named in the charges which had been made within the two six-month periods covered by them.[11]

This paragraph epitomizes his concept of what was before him:

"An important question here is whether or not the records reflect a refusal on the part of the Respondent to bargain at a time when it was honestly at an impasse with the Union and was fully convinced that the Union no longer represented a majority of the employees in the bargaining unit, or whether the Respondent's refusal to bargain was not motivated by a good faith doubt of the Union's majority status. The critical question is whether under the circumstances of this case the employer was entitled to withdraw recognition of the Union on the basis of a good faith doubt as to the Union's majority. [Citing several cases.]"

10. What the Seventh Circuit said in the Kohler case, at 220 F.2d at page 7, is worthy of note here:

"* * * if it [the Board] gets so completely outside of the situation which gave rise to the charge that it may be said to be initiating the proceeding on its own motion, then the complaint should fall as not supported by the charge.

11. Petitioner also relies heavily on our case of N.L.R.B. v. Harris, 1953, 200 F.2d 656, 658. The two cases do bear some resemblance in their facts, but the action taken in Harris subsequent to the filing of the several charges was merely a carrying out of what had been determined upon before the last charge was filed, and was merely the culmination, closely related in point of time, of a series of closely related happenings during the period covered by the charges.

In Harris, the union and the employer had negotiated for 3½ years, and in early January, 1950, it appeared that the negotiations were to be fruitful. January 7, the union advised the employer that it desired to discuss the new statutory minimum wage schedule to become effective January 25. The employer consented to meet with the union in early February, and the union pressed for a definite date, but the employer finally postponed the meeting until February 18 or 20. In the interim, the employer had raised wages and the union promptly advised that in so doing, it had breached the agreement between them and that the union would file charges. Upon receiving such advice, the employer responded that no further negotiations would be conducted "until the situation is clarified." This response was contained in a letter dated February 16, two days after the union had filed its last charge.

The basis of the Board's finding was that the employer had refused to bargain in good faith from the time it was advised, on February 10, that the union would file charges. This threat, within the ambit of the charges, caused the em-

We do not have any similar situation here. This charge grew out of the seven bargaining sessions held between November 21, 1953 and May 20, 1954. Neither the Trial Examiner nor the Board found, and the evidence does not reflect, that any lack of good faith was practiced during that period. The parties had discussed at length, paragraph by paragraph, a contract proposed by the Union; and Respondent had also submitted its own version of a contract. The question of seniority was discussed at six of the meetings, vacations at five, arbitration at three, duration of the contract at one, overtime at two, shifts at four, holidays at three, grievances at two, and wages at five of the meetings during the six month period.

The limited raise in wages of April 19 was the result of the discussions between the parties and was initiated by the Union.[12] While the Union representatives testified that they did not think they were notified of this wage increase, it is clear that the Company merely adopted the Union's proposal in making these minor adjustments. At all events, the Union made no objection or protest to what was done, and did not list this wage adjustment as an unfair labor practice when, within about four weeks, it filed its charge setting forth its grievances against the Company.

This Court has given a clear indication of the limitations surrounding the reception of evidence of transactions outside the six month statutory period, N.L.R.B. v. I.B.S. Mfg. Co., 1954, 210 F.2d 634, 636–637:

"He [the Trial Examiner] also agreed with the general counsel that evidence of events antedating the six months' period could properly be offered and considered as *background evidence* in determining whether respondents had violated the act. * * *

" * * * It is one thing to hold, as we have done, that it is admissible to add two or three names to the list of discharges *after the period,* or to otherwise *amplify and expand a charge by the addition of details* in line with its general substance. It is quite another to hold that *an entirely new and different cause of action* based on matters occurring more than six months before the cut off date for the filing of the charge may be asserted." [Emphasis added.]

These words of Chief Judge Hutcheson are in keeping with what we held in N.L.R.B. v. Newton, 1954, 214 F.2d 472, where we quoted at length (at pages 474–475) from the Seventh Circuit case of Indiana Metal Products Corp. v. N.L.R.B., 1953, 202 F.2d 613, 619, and is consonant with our recent holding in White v. N.L.R.B., Apr. 23, 1958, rehearing denied May 29, 1958, 255 F.2d 564.

What the Trial Examiner and the Board have done in the case before us is

---

ployer to break off negotiations, but notice of its action was deferred until two days after the last charge was actually filed. The Board held that this two-day delay, under the circumstances, was not fatal to the right of the Board to pass upon the action then taken. Our opinion states that further wage increases and work benefits were made by the employer subsequent to February 16, the time lapse not being indicated. At all events, it was the break, actually consummated before the last charge was filed but confirmed in writing two days after, which lay at the base of the Board's decision, which we affirmed. The difference between that case and this one is too apparent to require elaboration.

12. Cox, the Union's negotiator, testified: "I asked the company to take a look at the wage rate in the feed mill, that it appeared to me that there was too many classifications on the $1.36 rate, that it seems to me there was a need for some wage adjustment on those classifications. I asked them to look at it and consider it so we could discuss it at the next meeting."

The quoted testimony referred to the meeting of April 8. At the next meeting on April 22, the Company complied with the Union's request that the wage adjustments be then discussed by advising that it had considered the Union's suggestions and had made the adjustments

to issue an order against Respondent based upon its withdrawal of union recognition more than four months after the filing of the charge in the course of which a general across-the-board wage increase was granted. If the Union desired this issue to be placed before the Board, it had substantially ten months before the complaint was issued in which to file a new or an amended charge. For some reason the Union chose not to do this, and the Board and its agencies were without power under the law to do it for them, or to consider it as having been done. No serious argument is made that the order is, or could be, based upon anything happening prior to May 20, the time the charge was filed, or even prior to October 1. For these reasons, the petition to enforce the order of the Board is

Denied.

HUTCHESON, Chief Judge (concurring).

Were the only question in this case whether the record as a whole supports the Board's finding that, as charged by the Union and alleged in Par. 8 of the complaint respondent refused to bargain in good faith with the Union, in violation of Sec. 8(a)(5)(1) of the Act, I would content myself with concurring in the view of the majority that, under settled law, N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027, it does not.

In view, however, of the issue discussed in the opinion of the Board and that of its dissenting member and in the majority opinion and that of the dissenting judge of this court, whether the Board's opinion, that the charge was proved, was incorrectly based on matter not properly before the Board because it was not embraced in the charge, and because I agree with the dissenting member, I have concluded to point out briefly why I think that the Board majority was wrong, the dissenting member right.

*First*, it is to be noted that *in the charge against employer* filed by the Union on May 20, 1954, Rec. p. 19, 20 and 21, only two violations were charged. One of these was that on or about November 20, 1953, respondent refused to bargain collectively with the Union. The other was that on or about April 23 and April 24, 1954, the dates named in the charge, certain employees were discriminatorily discharged.

*Second*, it will be noted that, while paragraph 8 of the complaint, record p. 88, alleges, as was charged in violation No. 1 of the charge, that on or about November 20, 1953, respondent refused to bargain, violation No. 2 of the charge, the discriminatory discharges of employees complained of, was not alleged.

*Third*, and this is the crux of the matter, paragraph 9 of the complaint, alleging:

"On or about Oct. 7, 1954, [a date five months after the filing of the charge], respondent, without notice to the Union, put into effect a general wage increase for all employees in the unit described above in par. 5."

undertakes in effect without any charge supporting it to complain of a violation having no connection with or relation to the two violations charged to have occurred before the charge was filed. The result is that the examiner, the majority of the Board and the dissenting judge in this court have been led to find a violation of the matter charged in paragraph 9 of the complaint, on the specious claim that the matter so alleged was supported by the charge. In saying this, I agree with the dissenting member of the Board that but for this allegation, unsupported by any charge and for the proof that came in under it, there was, there could be, no reasonable basis for the finding of the Board. Without aid from this source, in short, the Board's finding, that the respondent did not bargain in good faith, runs directly counter to the teach-

as requested ranging from two to five cents per hour to some of the employees

of the feed mill, same to be effective as of April 19.

ings of the statute, the American National Insurance Company case, supra, and all the cases following in its train, including White v. N.L.R.B., 5 Cir., 255 F.2d 564, April 23, 1958. In short, what has happened here is that by the device of injecting into the case entirely new matter completely unrelated to the charge, the regional director, in violation of the provisions of the Act, that no complaint can be filed except one based upon a charge, has filed a complaint, and the Board has heard and condemned the respondent in respect of matters which, because of the lack of a charge, were not before it. In my opinion, none of the cases cited and discussed support the Board's finding, and I concur in denying enforcement.

RIVES, Circuit Judge (dissenting).

According to my view, substantial evidence on the record as a whole amply supports the Board's finding that respondent refused to bargain in good faith with the Union in violation of Section 8(a)(5) and (1) of the Act. Keeping in mind the date on which the charge was filed, and with the strictest possible application of the Section 10(b) limitation, the following occurred between November 21, 1953 and May 20, 1954: (A) Respondent's negotiators functioned under instructions from its president that they were not to yield in any respect on three important matters: (1) Seniority was not to be the sole factor governing promotions. (2) The contract must not contain an arbitration provision. (3) The contract must contain a no-strike clause with a monetary penalty for its breach. Restrictions (2) and (3) are especially important when considered together. Respondent could not in good faith demand that the Union surrender its statutory right to strike and at the same time refuse to agree upon some other effective method of securing a review of grievances. "Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike." Textile Workers Union of America v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972. By thus circumscribing the authority of its negotiators, the respondent effectively prevented any bona fide bargaining. (B) The Union repeatedly requested the respondent to furnish it with a list of employees together with classifications, wage rates, and employment dates, and the respondent supplied a partial list only, and continually failed to live up to its promise to supply other such relevant data. National Labor Relations Board v. Item Company, 5 Cir., 1955, 220 F.2d 956. (C) On April 19, 1954, respondent put into effect wage adjustments at its feed mill admittedly without consulting the Union, and thereby clearly showed that it was merely going through the motions of collective bargaining. Armstrong Cork Co. v. National Labor Relations Board, 5 Cir., 1954, 211 F.2d 843, 847; National Labor Relations Board v. H. G. Hill Stores, 5 Cir., 1944, 140 F.2d 924, 926. The foregoing, along with a number of other practices noted in the Examiner's Report and in the Board's Decision, occurred within the most rigid concept of the six-month period prior to the filing of the charge. Without reference to subsequent events, I think that the foregoing furnishes substantial evidence to support the Board's finding that respondent refused to bargain in good faith.

The charge is no part of the pleadings in the case. It precedes the filing of the complaint, and has for its purpose the setting in motion of a preliminary investigation to determine whether or not a complaint based upon such charge should issue. National Labor Relations Board v. Westex Boot & Shoe Co., 5 Cir., 1951, 190 F.2d 12. The charge need not, as the majority implies, be restricted to "*actions which have already been taken.*" To the contrary, the charge required by Section 10(b) of the Act is " * * * that any person has engaged in *or is engaged in* any such unfair labor practice, * * *." (Emphasis supplied.) Accordingly, on May 20, 1954, the Union charged that the respondent "has en-

gaged in *and is engaging in* unfair labor practices within the meaning of Section 8(a), subsections (1) and (3) and (5) of the National Labor Relations Act." (Emphasis supplied.) "Is engaging in" carried the time element up to the filing of the complaint. The complaint alleged that respondent had unlawfully refused to bargain on or about November 21, 1953, *"and at all times thereafter."* (Emphasis supplied.) It was entirely proper, I think, for the complaint to include such conduct occurring after the charge. National Labor Relations Board v. Harris, 5 Cir., 1953, 200 F.2d 656, 658; National Labor Relations Board v. Anchor Rome Mills, Inc., 5 Cir., 1956, 228 F.2d 775, 779; National Labor Relations Board v. Local 1423, United Brotherhood of Carpenters, etc., 5 Cir., 1956, 238 F. 2d 832, 836. With deference, the contrary construction of Section 10(b) by the majority seems to me excessively technical and restrictive, and, if sustained, I believe that it will seriously cripple the Board in any effective enforcement of the Act.

On October 7, 1954, the respondent granted a general wage increase to its employees which the majority concedes was "without specific notice" to the Union representatives, but states that it was "after discussion" with them, and was also after the respondent had "concluded that the Union no longer represented a majority of employees." On both of those statements I disagree, and find the facts to be accurately stated in the parts of the Board's brief quoted in the margin.[1]

I think that the Board had a right to consider the October 7, 1954, general wage increase and the November 19, 1954, express withdrawal of recognition from and refusal to continue to meet with the Union. When those acts are considered, it is not even debatable that the Board's finding that respondent refused to bargain in good faith with the Union is supported by substantial evidence on the record as a whole. The proof, indeed, goes beyond any reasonable doubt. I therefore respectfully dissent.

1. "In the latter part of September respondent's president, without consulting the Union, decided to grant a general wage increase of seven cents per hour an informed the mill supervisors of his decision (R. 119–120; B.A. 66–68, 73). On October 4 or 5, Union negotiator Wellborn stated to Martin, respondent's vice-president, 'I hear that you have given a seven cent raise to the employees.' When Martin admitted this, Wellborn asked, 'Aren't you aware that you should have contacted or told me or discussed it with me about giving the employees a raise.' Martin's reply was that seven or eight years earlier, when he was employed elsewhere, he had given wage increases without contacting Wellborn and the latter had made no objection. (R. 120; B.A. 58–60, 63–64). On October 6, respondent posted a notice officially announcing the wage increase, which was made retroactive to October 4. Admittedly, respondent gave the Union no prior notice of this action (R. 120, 165, 175; B.A. 63–64, 68–73, 292).

"The meeting scheduled for October 10 was in fact held on October 15 (R. 161–162). * * *

"The next, and final, meeting was not held until November 19. On that date,

respondent stated that it felt that the Union was not interested in a contract and that it had received 'information from what the mill considers to be accurate reliable sources' that the Union no longer represented a majority of the employees in the bargaining unit. Respondent accordingly for the first time advised the Union that 'we just simply at this time do not recognize the Union as the bargaining agent for the employees at the plant' and that it was 're-fusing to bargain any further' (R. 121, 162; B.A. 20, 286, 289, 292). Prior to this meeting, the Union's majority had not been questioned (B.A. 21). The Union asked the source of the information regarding its alleged loss of majority, and respondent replied 'Just by word of mouth' (B.A. 21, 290).

"On the same day, respondent publicly announced its withdrawal of recognition in a notice posted on a plant bulletin board (R. 121, 166; B.A. 22–23, 108–109). In a letter transmitting a copy of this notice to the Union, respondent stated that 'the information which the Company had, with reference to the desire of its employees [not to be represented by the Union], came through verbal statements of the employees' *(ibid.).*"