907 F.2d 963
 134 L.R.R.M. (BNA) 2609, 116 Lab.Cas. P 10,204
 FACET ENTERPRISES, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America (UAW), Intervenor.
 No. 88-2268.
 United States Court of Appeals,
Tenth Circuit.
 July 3, 1990.
 
 Steven J. Fishman (Donald H. Scharg with him on the brief), of The Fishman Group, Bloomfield Hills, Mich., for petitioner.
 Joseph H. Bornong, Atty., N.L.R.B. (Paul J. Spielberg, Deputy Asst. General Counsel, N.L.R.B., with him on the brief), Washington, D.C., for respondent.
 Freya B. Weberman of Levin, Levin, Garvett & Dill, Southfield, Mich., Jordan Rossen, General Counsel, UAW, Leonard Page and Betsey A. Engel, Attys., UAW, Detroit, Mich., for intervenor.
 Before BALDOCK and EBEL, Circuit Judges, and SAM, District Judge.*
 BALDOCK, Circuit Judge.
 
 
 1
 Facet Enterprises, Inc. (Facet) petitions for review of a National Labor Relations Board (Board) order finding Facet liable for a series of unfair labor practices. The Board petitions for enforcement of the same order. Our jurisdiction arises under 29 U.S.C. Secs. 160(e) & (f). We enforce the Board's order in substantial part and remand for further consideration in light of this opinion.
 
 I. Background
 
 2
 Facet is a manufacturer of automotive parts headquartered in Tulsa, Oklahoma. Facet's operations include: 1) a 150-employee plant in Detroit, Michigan, 2) a 70-employee plant in Madison Heights, Michigan, and 3) a 300-employee plant in Elmira, New York. Employees at these plants were represented by the United Automobile, Aerospace and Agricultural Implement Workers of America, (the Union). Facet was created out of a divestiture of the Bendix Corporation in 1976 and adopted the three-plant master agreement between Bendix and the Union then in effect. In 1977 and 1980, Facet and the Union concluded master agreements covering all three plants as well as local supplemental agreements at each individual plant. The master agreements were ratified by a cumulative vote of the union members at all three plants; the local agreements were ratified by a local vote at each plant.
 
 
 3
 In the fall of 1983, Facet and the Union began negotiating new master and local agreements. Facet proposed wage concessions, a less-costly insurance plan and elimination of cost of living adjustments (COLAs). The Union sought wage increases and retention of COLAs. At the local level, disagreement existed over, inter alia, the classification of an Electron Beam Welder (EBW) operator at the Madison Heights plant. In October 1983, dissatisfied with the progress of negotiations, the employees voted to authorize their bargaining representatives to call a strike at any time. On November 2, 1983, the Madison Heights employees struck on account of Facet's movement of machinery out of the plant. On November 6, the employees at all three plants rejected the company's latest offer whereupon the Elmira and Detroit plants joined the strike. The strike proved unsuccessful and on February 17, 1984, the employees at the three plants voted to end the strike and return to work unconditionally. Facet ceased production at Madison Heights in July 1984 and closed the plant two months later. The Detroit plant closed in August 1984.
 
 
 4
 In the winter of 1984, the Union filed several unfair labor practice charges against Facet which form the basis of this appeal. After a trial before an ALJ, Facet was found liable of: 1) attempting to split the Detroit plant from the three-plant bargaining unit, 2) insisting to impasse on removing the EBW operator from the Madison Heights bargaining unit, 3) refusing to provide the Union with information necessary for the performance of its collective bargaining responsibilities, 4) unilaterally changing employment conditions after the strike without first bargaining to impasse on those subjects, and 5) refusing to reinstate unfair labor practice strikers after they unconditionally offered to return to work. The ALJ also found that Facet's improper conduct converted the Union's economic strike into an unfair labor practice strike. On appeal, the Board adopted substantially the ALJ's opinion, except his finding of unit-splitting; instead the Board held that Facet violated the National Labor Relations Act, 29 U.S.C. Secs. 151-169 (Act), by direct dealing with its picketing employees rather than bargaining through Union representatives.
 
 II. Direct Dealing
 
 5
 On Thanksgiving Day 1983, Facet's personnel director, Eugene Mullane, spoke with picketing workers in front of the Detroit plant. According to one witness, Mullane told the picketers that Facet "had given us everything that we wanted in the contract and that we should have been back to work, but our union refused to accept the contract." Rec. vol. II at 1473. On December 2, 1983, Facet sent a letter to its striking Detroit employees enclosing a copy of the company's latest bargaining proposal and exhorting employees to return to work under the terms of that offer. Employee Mary Lewis testified that, while picketing two days later, Mullane urged her to return to work because she had a good contract and suggested that she speak to the president of the Detroit local. Id. at 1446. On December 5, Facet President James Malone urged picketing employees to return to work. According to one picketer, Malone informed the strikers that they should "get the people together, talk to the union representatives and see if we couldn't talk to our union representative at the local and see if you couldn't get them all to agree to go back to work." Id. at 1386; see id. at 1396-97. According to one witness, Malone told the picketers:
 
 
 6
 that the Elmira people were going to be able to start drawing compensation after so many weeks and did we think that they were going to offer to give us part of the money, and he said--and we said no. And so, he said you have got to ... think about yourselves.... And then he also said not to think about the union. The union wasn't going to be too worried about [the strikers] because ... the union people were going to be getting their money, he said.
 
 
 7
 Id. at 1380. Employee Ilah Drake testified that Malone acknowledged that he should not be speaking directly with the picketing employees: "I suppose I will get in trouble over this conversation that I am having with you people." Id. vol. I at 1385. Malone informed picketers that Facet would bring in replacement workers and consider relocating the Detroit plant if the strike did not end soon. Id. at 254. On December 13, 1983, Facet mailed a second letter to the striking Detroit employees responding to some of press releases issued by the Union. The letter noted that the Elmira and Madison plants were only marginally profitable while the Detroit plant was highly profitable. Facet argued that it was unfair for the Detroit plant to subsidize the other two plants workers: "Your union leadership is unfairly punishing you for the sake of other operations." (emphasis in original). The ALJ heard testimony that on December 15 Mullane spoke again with a picketing employee urging her to "bring your people back to work." Id. vol. II at 1410.
 
 
 8
 The Board found that Facet's communications with its striking employees constituted direct dealing in violation of Sec. 8(a)(5) of the Act, 29 U.S.C. Sec. 158(a)(5). Although we review questions of law de novo, our review of this factual determination is governed by 29 U.S.C. Sec. 160(e) which provides: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Therefore, even where we would reach a different conclusion upon de novo review, we must affirm the Board's determination unless there is insufficient evidence in the record to support its factual determination. Lear Siegler Inc. v. NLRB, 890 F.2d 1573, 1575 (10th Cir.1989).
 
 
 9
 Once a bargaining unit selects its bargaining representative through a Board-certified election, the employer must bargain in good faith with that representative alone. Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 683-84, 64 S.Ct. 830, 832-33, 88 L.Ed. 1007 (1944). An attempt by the employer to bypass the bargaining representative in conducting negotiations constitutes direct dealing, a violation of Sec. 8(a)(5) of the Act. Id.; NLRB v. Pratt & Whitney Air Craft Div., 789 F.2d 121, 134 (2d Cir.1986). On the other hand, an employer's right to communicate with its employees falls under the protection of the first amendment. NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). This right is codified in Sec. 8(c) of the Act which provides:
 
 
 10
 The expressing of any views, arguments, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit.
 
 
 11
 29 U.S.C. Sec. 158(c). Determining whether an employer has engaged in direct dealing therefore is "a complex task involving a balancing of the rights of the workers, the union, and the employer." Pratt & Whitney, 789 F.2d at 135. "The fundamental inquiry in a direct dealing case is whether the employer has chosen 'to deal with the Union through the employees, rather than with the employees through the Union.' " Id. at 134 (quoting NLRB v. General Elec., 418 F.2d 736, 759 (2d Cir.1969), cert. denied, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970)).
 
 
 12
 Standing alone, the two letters Facet sent to its Detroit employees would be insufficient evidence to support a finding of direct dealing. Rather, the letters are legitimate attempts to communicate Facet's bargaining position and controvert public statements by the Union. See 29 U.S.C. 158(c). However, when the letters are combined with the picketline communications, the Board reasonably could conclude that Facet engaged in direct dealing by: 1) exhorting employees to talk to the Union on Facet's behalf, 2) warning them of dire consequences of refusing to return to work, 3) suggesting that they hold a meeting to force the Union to agree to a separate vote for the Detroit plant, and 4) disparaging the Union leadership's commitment to its members' interests. See Pratt & Whitney, 789 F.2d at 134. Accordingly, the Board's finding that Facet engaged in direct dealing with its employees is supported by substantial evidence.
 
 III. Due Process
 
 13
 Paragraph 12 of the Board's Complaint and Notice of Hearing read in pertinent part:
 
 
 14
 Since on or about December 2, 1983, and continuing to date, [Facet] has refused to bargain in good faith with the [Union] as the exclusive collective bargaining representative of the employees in the Unit by engaging in a course of conduct designed to, or with the foreseeable consequence of, splitting off the Detroit plant from the historic multiplant Unit without the consent of the [Union], including, inter alia:
 
 
 15
 (a) On or about December 2, 1983, mailing letters containing copies of [Facet's] November 15, 1983, contract proposal for the Detroit plant only to the striking employees of the Detroit plant, urging said employees to return to work under the terms of the said November 15, 1983 offer;
 
 
 16
 (b) On or about November 24, December 4, and December 16, 1983, by its agent E.J. Mullane, urging striking employees at the Detroit plant to accept and/or return to work under the terms of [Facet's] November 15, 1983, contract proposal for the Detroit plant;
 
 
 17
 (c) On or about December 6, 1983, by its agent, James R. Malone, urging striking employees at the Detroit plant to accept and/or return to work under the terms of [Facet's] November 15, 1983, contract proposal for the Detroit plant;
 
 
 18
 . . . . .
 
 
 19
 (f) On or about December 13, 1983, mailing letters to the striking employees of the Detroit plant urging said employees to accept and/or return to work under the terms of [Facet's] November 15, 1983, contract proposal for the Detroit plant.
 
 
 20
 After an extensive trial, the ALJ held that Facet violated its statutory duty to bargain in good faith by "engaging in conduct ... calculated to split off the Detroit plant from the established appropriate bargaining unit...." Facet Enter., No. 7-CA-22929, 7-CA-23154, 7-CA-23817, unpub. order at 49 (NLRB Feb. 27, 1987). However, the Board rejected the ALJ's unit-splitting determination, finding instead that Facet was culpable for direct dealing. Facet Enter., No. 7-CA-22929, 7-CA-23154, 7-CA-23817, slip op. at 4-5 NLRB Dec. (CCH) p 15,046 (Jul. 29, 1988). In its amended conclusions of law, the NLRB held: "By dealing directly with employees about terms and conditions of employment, [Facet] refused to bargain in good faith with the Union in violation of Section 8(a)(5) of the Act." Id. at 10. Facet argues that the switching of legal theories by the Board on appeal violated due process by depriving it of notice of and an opportunity to contest the direct dealing violation. This issue presents a question of law subject to de novo review. See United States v. Fredrick, 897 F.2d 490, 491 (10th Cir.1990).
 
 A.
 
 21
 As a threshold question, we must consider whether Facet's failure to bring its due process argument before the Board deprives us of jurisdiction to consider that issue. Section 10(e) of the Act stipulates that "[n]o objection that has not been urged before the Board ... shall be considered by [a reviewing] court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. Sec. 160(e). A reviewing court thus "lacks jurisdiction to review objections that were not urged [previously] before the board...." Woelke & Romero Framing v. NLRB, 456 U.S. 645, 666, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982). Section 10(e) serves "the salutary policy ... of affording the Board opportunity to consider on the merits questions to be urged upon review of its order[s]." Marshall Field & Co. v. NLRB, 318 U.S. 253, 256, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943). See NLRB v. Cheney Cal. Lumber, 327 U.S. 385, 389, 66 S.Ct. 553, 554, 90 L.Ed. 739 (1946) (Section 10(e) insures that "all controversies of fact, and the allowable inferences from the facts, be thrashed out ... in the first instance before the Board."); NLRB v. L & B Cooling, Inc., 757 F.2d 236, 240 (10th Cir.1985) ("the purpose behind [Sec. 10(e) ] is to assure that the Board is fully alerted to the contentions of the parties and aware that they should be addressed and ruled upon."). Section 10(e) also provides the Board with notice and insures against duplicative appeals to the courts. Local 900, Int'l Union of Elec., Radio & Machine Workers v. NLRB, 727 F.2d 1184, 1191 (D.C.Cir.1984).
 
 
 22
 Failure to object to the Board's action does not preclude judicial review when a motion for reconsideration would be an empty formality not serving the purposes of notice, efficiency or providing the Board with first opportunity to consider an issue. See id. at 1192. In Oil, Chemical & Atomic Workers Int'l Union, Local 1-547 v. NLRB, 842 F.2d 1141 (9th Cir.1988), the Ninth Circuit held that Sec. 10(e) did not bar judicial review of a challenge to the retroactive application of a rule where "the Board necessarily had notice that [retroactivity] was an issue which would be raised by the parties if the rule of law was changed." Id. at 1144 n. 2. Similarly, in NLRB v. Local 25, Int'l Bhd. of Elec. Workers, 586 F.2d 959 (2d Cir.1978), the Second Circuit held that Sec. 10(e) did not bar consideration of whether Board proceedings had violated due process, even though such claim had not previously been raised before the Board. Id. at 962. Finally, in NLRB v. Blake Constr., 663 F.2d 272 (D.C.Cir.1981), an employer challenged on due process grounds the Board's issuance of a citation based on a different legal theory from that alleged in the complaint. While the employer had not brought the due process objection before the Board, the D.C. Circuit nevertheless considered the issue:
 
 
 23
 While deference is certainly due to the laudatory objective of section 10(e) to give the Board the first opportunity to resolve "on the merits" questions urged on review of its orders, courts are and should be reluctant to enforce orders that emanate from proceedings conducted contrary to the clear requirements of the Administrative Procedures Act and devoid of basic due process guarantees unless there has been a deliberate bypass of the Board's rules.
 
 
 24
 Id. at 284 n. 34 (citations omitted). These cases demonstrate that an exception to Sec. 10(e) is recognized when the policies underlying the rule are not implicated.
 
 
 25
 In the instant case, the Board argues that Woelke and International Ladies' Garment Workers' Union v. Quality Mfg., 420 U.S. 276, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975), preclude our review of Facet's due process claim. In Woelke, the Supreme Court held that because the employer had not challenged the Board's finding, the court of appeals lacked jurisdiction over a due process claim. 456 U.S. at 666, 102 S.Ct. at 2083. In Quality Mfg. the Board held that an employer violated Sec. 8(a)(1) of the Act by refusing to allow a union representative to accompany an employee during a disciplinary interview. Quality Mfg. Co., 195 NLRB 197, 199 (1972), enforcement granted in part sub nom., NLRB v. Quality Mfg., 481 F.2d 1018, 1025 (4th Cir.1973), rev'd, 420 U.S. 276, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975). This right was not recognized previously giving rise to a due process argument by the employer. The employer appealed to the Supreme Court arguing, inter alia, that the Board's change in theory violated its right to due process. However, the Supreme Court rejected this argument, holding that because the employer neglected to bring this claim before the Board, judicial review was precluded. Quality Mfg., 420 U.S. at 281 n. 3, 95 S.Ct. at 975 n. 3.
 
 
 26
 Woelke and Quality Mfg. are wholly distinguishable from the case at bar; in neither case did the Board have an opportunity to consider the employer's due process claims. Therefore, the policies underlying Sec. 10(e), i.e., notice, efficiency and providing the Board with the first opportunity to consider a claim, would have been undermined had the Supreme Court allowed judicial review. In contrast, the Board in this case considered specifically the due process implications of changing the legal theory of Facet's liability from unit-splitting to direct dealing.[1] In contrast to Quality Mfg. where the Board never considered the due process implications of its holding, see 195 NLRB at 198-99, the NLRB fully considered that issue here. Because the salutary policies underlying Sec. 10(e), are not implicated here where the due process issue already was "before the Board," Woelke, 456 U.S. at 666, 102 S.Ct. at 2083, Facet's filing a motion seeking reconsideration of the Board's decision would have been "an empty formality." See Local 900, 727 F.2d at 1192. Section 10(e) does not require "such a triumph of technical pleading over fundamental fairness." Blake Constr., 663 F.2d at 284. We therefore hold that Facet's failure to address the due process issue to the Board does not deprive us of jurisdiction to consider this claim here. See generally Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 682 (D.C.Cir.1983) (court may find exhaustion when party did not raise issue before agency if agency considers issue on its own motion).
 
 B.
 
 27
 A respondent charged with an unfair labor practice must be served with a charge stating the practice alleged and containing "[a] clear and concise description of the acts which are claimed to constitute unfair labor practices...." 29 C.F.R. Sec. 102.15(b). However, variation between an unfair labor practice charged in the complaint and one found by the Board does not deprive a respondent of due process where it is clear that the respondent "understood the issue and was afforded full opportunity to justify [its actions]." NLRB v. MacKay Radio & Tel. Co., 304 U.S. 333, 350, 58 S.Ct. 904, 913, 82 L.Ed. 1381 (1938). A material issue which has been fairly tried by the parties therefore may be decided by the Board regardless of whether it has been specifically pleaded. NLRB v. Tricor Prods., 636 F.2d 266, 271 (10th Cir.1980); NLRB v. Thompson Transp., 421 F.2d 154, 155 (10th Cir.1970); J.C. Penney Co. v. NLRB, 384 F.2d 479, 482-83 (10th Cir.1967). In determining whether a respondent can be held liable for an unfair labor practice not charged in the complaint, the central inquiry is fairness: considering the circumstances of the case, did the respondent know what conduct was being alleged and have "a fair opportunity to present [its] defense?" Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 1074 (1st Cir.1981). See, e.g., Tricor Prods, 636 F.2d at 271 (change of theory did not prejudice employer when employer did not challenge testimony and no additional witnesses could shed light on the circumstances); George C. Foss Co. v. NLRB, 752 F.2d 1407, 1411-12 (9th Cir.1985) ("technical and semantic" divergence between charge in complaint and violation found by Board did not violate due process); Free Flow Packaging v. NLRB, 566 F.2d 1124, 1131 (9th Cir.1978) (no due process violation when cross-examination and rebuttal testimony would not have been any different if evidence had been directed to prove additional violation).
 
 
 28
 Although an employer may be held liable for violating a different section of the Act than charged in the complaint, "[s]imply because violations could have been alleged in addition to those in the complaint does not obligate the employer to defend against all possibilities." NLRB v. Pepsi-Cola Bottling Co. of Topeka, 613 F.2d 267, 274 (10th Cir.1980). Accordingly, "[f]ailure to clearly define the issues and advise an employer charged with a violation of law of the specific complaint he must meet and provide a full hearing upon the issue presented is ... to deny procedural due process of law." J.C. Penney, 384 F.2d at 483; see NLRB v. Quality C.A.T.V., 824 F.2d 542, 547 (7th Cir.1987) ("the simple presentation of evidence important to an alternative claim does not satisfy the requirement that any claim at variance from the complaint be 'fully and fairly litigated' in order for the Board to decide the issues without transgressing ... due process rights"); Conair Corp. v. NLRB, 721 F.2d 1355, 1372 (D.C.Cir.1983), cert. denied, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984).
 
 
 29
 In Pepsi-Cola, the General Counsel charged an employer with refusing to reinstate unfair labor practice strikers after they made an unconditional offer to return to work. The ALJ found that the strike was economic and consequently held that the employer's failure to reinstate striking workers was not an unfair labor practice. The Board reversed on appeal, holding that although the strike was economic in nature, the employer nonetheless committed an unfair labor practice by discriminating against union members in hiring. This court found that discrimination in hiring and refusal to hire unfair labor practice strikers constituted distinct violations of the Act with divergent standards of proof. Id. at 270. Because no mention was made in the record of discrimination in hiring and the issue was not litigated by the parties, we held that the Board's switching of legal theories on appeal violated the employer's right to procedural due process. Id. at 275. See also J.C. Penney Co., 384 F.2d at 483 (due process violated when employer was not put on notice that statement to employee was in issue and the record did not disclose that issue actually litigated); Quality C.A.T.V., 824 F.2d at 546-47 (Board violated due process by switching theories on appeal when record contained no evidence that the parties or the ALJ considered alternative theory); Conair Corp., 721 F.2d at 1368 (employer denied due process where Board amended complaint to include charge that employer unlawfully discharged striking employees where employer lacked notice and an opportunity to litigate the amended claim); NLRB v. Complas Indus., 714 F.2d 729, 733-34 (7th Cir.1983) (employer denied due process when the Board amended the original complaint and employer had no meaningful opportunity to challenge amended claim).
 
 
 30
 In the instant case, Facet was charged and held liable on a unit-splitting theory; however, on appeal the Board found Facet liable of direct dealing.[2] Unlike direct dealing, the essential inquiry in a unit-splitting case is whether there exists a "community of interests" between the disparate plants so as to constitute a single bargaining unit and whether the employer sought to undermine that multiplant bargaining unit.[3] See International Union of Elec. Radio and Machine Workers v. NLRB, 604 F.2d 689, 694-96 (D.C.Cir.1979); R. Gorman, Basic Text on Labor Law 76 (1976). The charge of attempted unit-splitting therefore constitutes "quite a different offense" from direct dealing, Pepsi-Cola, 613 F.2d at 273; each offense rests upon a different legal theory and requires divergent components of proof. Accordingly, we must examine the record to determine whether Facet had notice that direct dealing was at issue and a meaningful opportunity to contest the charge. See Pepsi Cola, 613 F.2d at 273.
 
 
 31
 The complaint against Facet does not explicitly mention direct dealing as a charged offense. Nevertheless, the facts underlying the direct dealing offense are alleged in paragraph 12(a), (b), (c) and (f) of the complaint. Our due process concerns are not alleviated merely because the facts alleged in the complaint could be encompassed under a direct dealing as well as a unit-splitting theory. See Pepsi-Cola, 613 F.2d at 274; Quality C.A.T.V., 824 F.2d at 547. However, the record[4] in this case reveals that Facet had at least constructive notice that the General Counsel intended to pursue both a unit-splitting and a direct dealing theory. During the General Counsel's opening argument, it was acknowledged that both direct dealing and a unit-splitting theory were at issue.[5] In a subsequent conversation, the General Counsel explained that, even if the unit-splitting allegation in the complaint were dropped entirely, Facet still would be liable for direct dealing:
 
 
 32
 JUDGE BERNARD: I want to see what your position is; because I have just heard a moment ago what the gravamen of the complaint was, you know. I was looking at the facial indicators on the complaint. Now the gravamen is only that [Facet] tried to split [the unit] after the strike started.
 
 
 33
 MR. RUBIN: But there is a second part of the gravamen. And that is that those actions that we alleged, that you just enumerated, also consisted of direct dealing with the employees....
 
 
 34
 Rec. vol. I. at 623-24. We observe that Facet's counsel neither objected to the government's intention to proceed under a direct dealing theory nor indicated that he was unprepared to go forward. Although the General Counsel certainly could have drafted a better complaint explicitly setting out direct dealing as an alternative theory of liability, we are convinced that the testimony at trial, together with the remarks between the General Counsel and ALJ, provided Facet with notice that both theories would be relied upon by the Board. See Tricor Prods., 636 F.2d at 271.
 
 
 35
 Any doubt that we might have as to whether Facet received notice that the General Counsel intended to proceed under a direct dealing as well as a unit-splitting theory is belied by our examination of Facet's conduct at trial. Facet's cross-examination of the witnesses to the direct dealing reveals that the company sought to justify its communications as informational and non-coercive, thus falling under Sec. 8(c) of the Act.[6] Facet also sought on cross-examination to establish that it was not attempting to deal with the union through its employees but rather was directing its communication toward the Union.[7] See Pratt & Whitney, 789 F.2d at 134. Indeed, most of the questions in Facet's cross-examination of the direct dealing witnesses bore no relevance to the issue of unit-splitting; they were cognizable only under a theory of direct dealing.[8] See Free Flow Packaging, 566 F.2d at 1131 (no due process violation when cross-examination would not have been any different if evidence had been directed toward additional violation). Based upon our review of the record, we conclude that Facet "understood the [direct dealing] issue and was afforded full opportunity to justify [its actions]." MacKay Radio, 304 U.S. at 350, 58 S.Ct. at 913. While not explicitly mentioned in the complaint, the issue of direct dealing was fully and fairly litigated at trial.
 
 
 36
 IV. Insistence to Impasse on EBW Classification
 
 
 37
 The EBW was a highly profitable component of Facet's Madison Heights operation. In the fall of 1983, the EBW was operated by Union member Donald Doctor. Facet previously had sought to remove the EBW classification from the unit during negotiation of the 1980 contract. The company advanced a similar proposal throughout the 1983 negotiations which the Union likewise rejected. On November 2-3, 1983, Facet and the Union commenced a marathon bargaining session whereupon Facet presented its "final" offer to the Union containing five inseparable "hang tough" issues. Rec. vol. III at 2034-37. The fourth "hang tough" issue was the EBW proposal which Facet's director of industrial relations told the Union "must be a salary job." Id. at 2035. The Union rejected Facet's proposal and informed the company that retaining the EBW position within the bargaining unit was an issue on which the membership would strike. Id. vol. II at 2031. On November 9, in a letter to the Union, Facet confirmed the parties "current impasse" on the issue. In December 1983, Donald Doctor was appointed to the salaried position of supervisor and notice was posted for an EBW set-up operator to fill Doctor's position. Doctor's duties were substantially the same after his promotion and the new EBW position was never filled.
 
 
 38
 Labor negotiations are divided into two major subject areas: mandatory subjects regulating wages, hours and working conditions and permissive subjects covering all other areas. See Gorman, supra p. 17 at 498. Either party to a labor negotiation may bargain to impasse[9] over a mandatory subject of bargaining. Id. In contrast to mandatory subjects of bargaining, parties to labor negotiations are not obligated to negotiate over permissive bargaining subjects. Newspaper Printing Corp. v. NLRB, 692 F.2d 615, 620 (6th Cir.1982). Thus, an employer who conditions acceptance of a collective bargaining agreement upon acceptance of a permissive subject of bargaining violates Sec. 8(a)(5) of the Act. NLRB v. Wooster Div. of Borg-Warner, 356 U.S. 342, 348-50, 78 S.Ct. 718, 722-23, 2 L.Ed.2d 823 (1958). The scope of a bargaining unit constitutes a permissive subject of bargaining, regardless of whether the unit previously has been certified by the Board. Newspaper Printing Corp., 692 F.2d at 619. A party who bargains to impasse over the scope of the bargaining unit therefore commits an unfair labor practice by taking a permissive subject of bargaining to impasse. Radio & Machine Workers, 604 F.2d 689 at 696.
 
 
 39
 Unlike the scope of a bargaining unit, transfer of work out of a unit by an employer constitutes a mandatory subject of bargaining. Newspaper Printing Corp. v. NLRB, 625 F.2d 956, 964 (10th Cir.1980), cert. denied, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981). Therefore, unless transfers are prohibited under the collective bargaining agreement, an employer may transfer work out of the bargaining unit after bargaining to impasse, so long as it first bargains in good faith and is not motivated by anti-union animus. Id. at 964-65; see Boeing Co. v. NLRB, 581 F.2d 793, 797 (9th Cir.1978); University of Chicago v. NLRB, 514 F.2d 942, 949 (7th Cir.1975). " 'It does not follow however, that an employer, under the guise of the transfer of unit work, may alter the composition of the bargaining unit. To do so would not only modify the job functions of various unit members but also affect their right to representation.' " Newspaper Printing Corp., 625 F.2d at 964-65 (quoting Newport News Shipbuilding & Dry Dock Co. v. NLRB, 602 F.2d 73, 77-78 (4th Cir.1979)). Where the duties of the newly-designated out-of-unit employees are substantially similar to those of the unit employees, the transfer may be a sham and consequently subject the employer to liability under Sec. 8(a)(5). NLRB v. Bay Shipbuilding Corp., 721 F.2d 187, 190-91 (7th Cir.1983).
 
 
 40
 Facet's proposal explicitly sought to take the EBW operator out of the bargaining unit. There was nothing wrong with advancing this proposal initially as the Union might have wished to bargain over its implementation. But as a permissive subject of bargaining, Facet was proscribed from insisting upon the subject once the Union communicated its unwillingness to negotiate. See Borg-Warner, 356 U.S. at 348-50, 78 S.Ct. at 722-23; Newspaper Printing Corp., 692 F.2d at 619. Facet nevertheless included the EBW proposal as a "hang tough" issue in its "final" offer, despite the company's knowledge that it was a strike issue for the Union. Finally, Facet acknowledge that a state of impasse existed in its letter to the Union. This conduct constitutes substantial evidence that Facet argued to impasse over the composition of the EBW unit classification.
 
 
 41
 Facet argues that its EBW proposal did not contemplate a change in unit scope, a permissive subject of bargaining; rather it implicated a transfer of work out of the unit, a mandatory subject. Facet therefore contends that it could take the EBW issue to impasse and unilaterally promote Doctor out of the unit once a valid impasse occurred. See Newspaper Printing Corp., 625 F.2d at 964-65. However, the ALJ heard evidence that Doctor's duties as a non-union supervisor were substantially similar to his duties as a unit employee and that the position allegedly created by Facet to replace Doctor went unfilled with no apparent effect on the EBW operation. The ALJ and Board reasonably could conclude from this evidence that Facet's transfer of work out of the unit was a mere guise motivated by anti-union animus rather than technological or managerial exigencies. See Bay Shipbuilding, 721 F.2d at 191. Accordingly, the Board's holding that Facet violated Sec. 8(a)(5) of the Act by insisting to impasse on a permissive subject of bargaining was supported by substantial evidence.
 
 V. Conversion
 
 42
 Labor law recognizes a distinction between strikes depending upon their cause. Gorman, Basic Text on Labor Law 399 (1976). Where employees strike in support of bargaining demands concerning wages, hours and working conditions such strikes are characterized as "economic." Id. Where employees strike in protest of employer conduct found subsequently to be an unfair labor practice, such strikes are characterized as "unfair labor practice strikes." Id. Employees who engage in an unfair labor practice strikes are guaranteed a more favorable remedy against the employers than employees who participate in an economic strike; upon an unconditional offer to return to work; unfair labor practice strikers are entitled to reinstatement with back pay, even if the employer has hired replacements in the interim. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 379 n. 5, 88 S.Ct. 543, 546 n. 5, 19 L.Ed.2d 614 (1967); Mastro Plastics v. NLRB, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956); NLRB v. Johnson Sheet Metal, 442 F.2d 1056, 1061 (10th Cir.1971).
 
 
 43
 Often, work stoppages originate as economic strikes and are "converted" by the subsequent conduct of the employer into an unfair labor practice strike. Gorman, supra p. 976, at 339. The basis for the conversion doctrine is that the employer's unfair labor practice prolonged the strike, delaying a settlement that otherwise would have been reached on the economic issues. Id. Merely because an employer commits an unfair labor practice during a strike does not automatically convert an economic strike into an unfair labor practice strike; there must be substantial evidence that the unfair labor practice aggravated or promoted the preexisting economic strike. NLRB v. Burkart Foam, 848 F.2d 825, 203-04 (7th Cir.1988). The employer's unfair labor practice need not be " 'the sole or even the major cause or aggravating factor of the strike,' but only that it was 'a contributing factor.' " Soule Glass & Glazing, 652 F.2d at 1080 (quoting NLRB v. Moore Business Forms, 574 F.2d 835, 840 (5th Cir.1978)) (emphasis in original). Thus, the Board may accord considerable weight to the strikers' own characterization of their motivation for continuing the strike after the employer's commission of an unfair labor practice. Id. See, e.g., Burkart Foam, 848 F.2d at 832 n. 6 (changing of picket signs by union to reflect employer's unfair labor practice evidence of conversion). To determine whether Facet's improper conduct effectuated a conversion, we consider each plant.
 
 A. Madison Heights
 
 44
 On November 6, 1983, the Madison Heights Local held a membership meeting where a ratification vote was taken on Facet's latest offer. The company's proposal was rejected overwhelmingly. Rec. vol. III at 2430-32. Prior to that vote, there was extensive discussion concerning Facet's attempt to remove the EBW classification from the unit. The membership reacted strongly against the EBW proposal and several members expressed a willingness to strike over that issue. In the words of one member, the EBW proposal was a substantial "thorn[ ] in the side," id. at 2432, contributing to the vote. Although the Madison Heights employees had many economic reasons for striking the facility, we find that a trier of fact reasonably could conclude that Facet's conduct with respect to the EBW issue expanded the dispute between Facet and the Union to include protest over the EBW. Accordingly, the Board's conversion finding with respect to the Madison Heights facility is supported by substantial evidence. See Soule Glass & Glazing, 652 F.2d at 1080.
 
 B. Detroit
 
 45
 On December 24, 1983, the Detroit Local called a membership meeting. Rec. vol. II at 1411-12. During that meeting, a Union official informed the membership that the Union was filing an unfair labor practice charge against Facet arising out of the company's picketline contacts with striking employees. The official asked if anyone else had been approached on the picketline. The Union also instructed each Local to change its picket signs to denote the fact that unfair labor practice charges had been filed. Id. vol. IV at 3910. The Board held that these actions prolonged the strike, thus converting the Detroit strike to an unfair labor practice strike as of December 24. Facet Enter., slip op. at 9.
 
 
 46
 Merely because Facet committed an unfair labor practice by dealing directly with Detroit employees does not mean that such illegal conduct converted the dispute into an unfair labor practice strike. See Burkart Foam, 848 F.2d at 832 n. 6. Unlike the membership meeting at Madison Heights, there is insufficient evidence in the record that Facet's unfair labor practice strengthened the resolve of the Detroit employees or contributed to a strike vote at the membership meeting. The mere fact that striking employees were informed of Facet's unfair labor practice does not in itself establish that such practice prolonged or exacerbated the strike. Moreover, the use of picket signs denoting an unfair labor practice charge, while evidence of conversion, see id., it is not conclusive of the issue. Rather, to sustain a finding of conversion, there must be some evidence in the record that the Detroit employees reacted to information of Facet's direct dealing substantively in a fashion which aggravated or prolonged the strike. See Vulcan Hart Corp. v. NLRB, 718 F.2d 269, 276 (8th Cir.1983). Mere conjecture will not suffice. Because the record contains insufficient evidence of any concrete acts or affirmations by the Detroit employees in response to Facet's direct dealing which prolonged or intensified the strike, we must reject the Board's finding of conversion.
 
 C. Elmira
 
 47
 During the third week of December 1983, the Elmira Local called a membership meeting to inform the membership of the unfair labor practice charges filed by the Union on December 15. Approximately 175 members attended. Rec. vol. III at 2540. A Union representative read the unfair labor practice charges to the membership, two-thirds of whom voiced opposition to Facet's conduct. Id. at 2546. After the meeting, the Local made new picket signs reflecting the fact that unfair labor practice charges had been filed. Id. at 2544. These signs were displayed on the picketline for the remainder of the strike. Id.
 
 
 48
 Unlike the record pertaining to the membership meeting of the Detroit Local, the record here contains evidence that Facet's direct dealing strengthened the resolve of the striking Elmira employees and expanded the strike to include unfair labor practice issues. Given the reaction of the Elmira membership upon being informed of Facet's unfair labor practice, it reasonably could be concluded that Facet's conduct contributed to the prolongation and exacerbation of the strike. Accordingly, there is substantial evidence in the record supporting the Board's finding that Facet's unfair labor practice in Detroit converted the Elmira economic strike to an unfair labor practice strike.[10]
 
 D. Cure
 
 49
 Facet argues that a notice distributed in February 1984 disavowing its intent to press the EBW issue to impasse or split the three-plant unit "cured" any unfair labor practices it may have committed; accordingly, under Trident Seafoods, 244 NLRB 566 (1979), enf'd, 642 F.2d 1148 (9th Cir.1981), the strike was transformed back to an economic strike as of that date. In Trident Seafoods, after improperly discharging striking employees, the employer contacted those employees and revoked their discharge. 244 NLRB at 569. The NLRB held that this action cured the underlying unfair labor practice transforming the work stoppage back to an economic strike as of the date of notice. Id. at 570.
 
 
 50
 Here, Facet committed additional unfair labor practices after issuing its curing notice. We therefore need not consider whether Facet's February communication cured the unfair labor practices arising from Facet's direct dealing and negotiating misconduct over the EBW. For even if the curing notice was effective as to those two violations, Facet's continued violation of the National Labor Relations Act obviated any possible benefit that the notice might have had. See generally Corning Glass Works v. Brennan, 417 U.S. 188, 208-09, 94 S.Ct. 2223, 2234-35, 41 L.Ed.2d 1 (1974) (employer cannot cure violation of Equal Pay Act where, by its subsequent conduct, it continues violation).
 
 VI. Failure to Provide Information
 A. Sec. 10(b) Time Bar
 
 51
 As a threshold matter, we must consider Facet's allegation that the General Counsel's charge that Facet failed to provide the Union with information is time-barred by Sec. 10(b) of the Act, 29 U.S.C. Sec. 160(b). The Union first challenged Facet's refusal to provide information in its amended charge filed January 9, 1984. This allegation was dismissed on January 30 and the Union declined to appeal. On February 24, 1984, the Union filed a charge alleging additional unfair labor practices by Facet. This charge did not address Facet's refusal to provide information. On August 3, 1984, the Board's Regional Director amended the Union's second charge alleging that, between December 1983 and February 1984, Facet repeatedly refused to provide the Union with information required under the Act. Facet argues that this additional charge, filed more than six months after the filing of the Union's second unfair labor practice charge, is time-barred by Sec. 10(b).A charge filed with the ... Board is not to be measured by the standards applicable to a pleading in a private lawsuit. Its purpose is merely to set in motion the machinery of an inquiry. The responsibility of making that inquiry, and of framing the issues in the case is one that Congress has imposed upon the Board, not the charging party. To confine the Board in its inquiry and its framing the complaint to the specific matters alleged in the charge would reduce the statutory machinery to a vehicle for the vindication of private rights. This would be alien to the basic purpose of the Act.
 
 
 52
 NLRB v. Fant Milling Co., 360 U.S. 301, 307, 79 S.Ct. 1179, 1183, 3 L.Ed.2d 1243 (1959) (citations omitted). This principle is reflected in Sec. 10(b) which provides in pertinent part:
 
 
 53
 [N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made.... Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon.
 
 
 54
 29 U.S.C. Sec. 160(b) (emphasis supplied). Thus, the six month limitation period imposed by Sec. 10(b) applies only to the filing and service of an unfair labor practices charge, not to the amending of a timely filed complaint. Complas Indus., 714 F.2d at 732. Despite this liberal pleading standard, however, the Board does not carry a " 'carte blanche to expand the charge as [it] might please or to ignore it altogether.' " Fant, 360 U.S. at 309, 79 S.Ct. at 1184 (quoting NLRB v. Fant Milling Co., 258 F.2d 851, 856 (5th Cir.1958)). Rather, in an amended complaint the Board only may allege unfair labor practices " 'which are related to those alleged in the charge and which grow out of them while the proceeding is pending before the Board.' " Id. (quoting National Licorice Co. v. Labor Board, 309 U.S. 350, 369, 60 S.Ct. 569, 579, 84 L.Ed. 799 (1940)).
 
 
 55
 Here, the Union timely filed its second charge within six months of Facet's failure to provide information. While the Union's charge did not mention specifically Facet's refusal to provide information, it directed the Regional Director's attention to the rancorous dealings between Facet and the Union in the winter of 1983-84. Therefore, the Board's amendment of the complaint to include failure to provide information naturally grew out of the Board's investigation of those dealings. See Fant, 360 U.S. at 309, 79 S.Ct. at 1184. Because the Board serves in an inquisitorial rather than an accusatorial capacity, see id. at 307, 79 S.Ct. at 1183, amending the timely filed complaint to include charges unearthed by the Regional Director in the course of his investigation did not violate Sec. 10(b), see Complas Indus., 714 F.2d at 732, especially where Facet has not demonstrated any prejudice from the delay, see, e.g., NLRB v. Process & Pollution Control Co., 588 F.2d 786, 788-89 n. 1 (10th Cir.1978) (failure to name subsidiary within six month period in original unfair labor practices charge did not run afoul of Sec. 10(b) where subsidiary was not prejudiced by lack of formal notice).
 
 B. Financial Information
 
 56
 At the commencement of 1983 contract negotiations, Facet made a presentation to the Union, reviewing the company's position in the marketplace plant-by-plant. Rec. vol. I at 315. Facet's negotiators displayed slides comparing the Facet's wages with those of its competitors and informed the Union that Facet needed some wage relief in order to remain competitive. Id. During negotiations of the Madison Heights local supplemental agreement, Facet's controller made another presentation to the Local on the company's financial status. Id. vol. II at 2026. Finally, in the December 13 letter to its Detroit employees, Facet justified seeking wage concessions at Madison Heights and Elmira on the basis of poor economic performance:
 
 
 57
 For the past four years the Elmira plant has lost money or been only marginally profitable. The Madison Heights plant has been marginally profitable for the past two years. Your plant, Facet's Fuel Devices Division, made a contribution to our record net income this past year. This is why the issues are different at Elmira and Madison Heights, and Detroit.
 
 
 58
 The Union sought repeatedly to examine Facet's books in order to evaluate its bargaining position and determine how to respond to Facet's proposals calling for wage concessions. Facet agreed to provide the Union with a current financial statement together with the opportunity for verification by an independent accountant, subject to a gag order. The Union presented evidence that the limited time period covered by Facet's offer, together with the gag order, precluded meaningful disclosure and assessment of the company's economic viability. Rec. vol. III at 2819-21. Facet offered testimony that its offer provided the Union's representative with an adequate opportunity to verify the accuracy of the company's claims and disclose the information to the Union. See id. vol. IV at 3378-79. The Board found that the conditions of Facet's offer prevented the Union from gleaning a meaningful picture of Facet's financial condition and held accordingly that Facet's conduct violated Sec. 8(a)(5).
 
 
 59
 Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy.
 
 
 60
 NLRB v. Truitt Mfg., 351 U.S. 149, 152-53, 76 S.Ct. 753, 755-56, 100 L.Ed. 1027 (1956). Failure to substantiate a claimed inability to pay a wage proposal therefore may constitute a failure to bargain in good faith. Id. This rule removes some of the gambling from labor negotiations relieving unions from the "Hobson's choice" of acquiescing to an employer's exaggerated claims of economic hardship or endangering its members' jobs by pressing an untenable wage demand upon a beleaguered employer. Nielsen Lithographing v. NLRB, 854 F.2d 1063, 1065 (7th Cir.1988).
 
 
 61
 An employer's duty to provide its employees' bargaining representatives with information on its financial status is triggered whenever an employer asserts an inability to meet a wage proposal. See Truitt, 351 U.S. at 152-53, 76 S.Ct. at 755-56. No "magic words" are required to trigger an employer's duty to disclose financial information; the employer's conduct only must be sufficiently specific to convey an inability to meet a union's wage proposal. NLRB v. Harvstone Mfg., 785 F.2d 570, 575 (7th Cir.), cert. denied, 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986). The test for determining whether an employer has communicated such an inability is whether it asserts that it "cannot," as opposed to "will not," pay a particular wage demand. See id. The mere assertion that an employer is operating at a competitive disadvantage or that its wages exceed the prevailing rate does not constitute a claim of inability to meet wage demands. Id.; Dallas Gen. Drivers, Warehousemen & Helpers Local 745 v. NLRB, 355 F.2d 842, 845 (D.C.Cir.1966); see, e.g., Washington Materials v. NLRB, 803 F.2d 1333, 1338-39 (4th Cir.1986) (employer's claim that it is losing bids to non-union companies paying lower wages does not trigger duty to disclose financial information).
 
 
 62
 In the instant case, Facet's initial communication with Union negotiators did not trigger a duty to disclose financial information. Facet's assertion that it was operating at a competitive disadvantage by paying higher wages than its competitors readily could be corroborated with information available to the Union; resort to Facet's books would be unnecessary. See Washington Materials, 803 F.2d at 1338-39; Harvstone Mfg., 785 F.2d at 575. However, the presentation by Facet's controller and the letter to the Detroit employees communicated information on the company's financial status that could not be confirmed with publicly available information. Only by examining the company's books could the Union confirm the accuracy of the controller's presentation and Facet's assertions as to the disparate profitability of the three plants. Substantial evidence therefore supports the Board's conclusion that Facet crossed the threshold between asserting an unwillingness to meet the Union's wage demands and asserting an inability to meet those demands. See id. Having opened the door on the issue of its ability to meet the Union's wage proposals, Facet was obligated to allow the Union to come inside and confirm the accuracy of the company's statements.
 
 
 63
 While Truitt requires employers to corroborate assertions of economic hardship where wages are concerned, it does not license unions to embark upon a fishing expedition through the company's books. Employers may impose reasonable restraints upon a union's access to its financial records, so long as the access permitted allows the union a meaningful opportunity to confirm the company's claims. Here, Facet limited the Union's access to the company's current financial condition. The ALJ heard testimony that a company's economic viability cannot be assessed only with current financial data; rather, comparative financial statements and supporting data over a period of years are needed. Moreover, in its letter to the Detroit employees, Facet discussed the respective profitability of the three plants over the past four years. To allow the Union a meaningful opportunity to corroborate the allegations contained within the letter, Facet therefore was obliged to provide the Union access to financial information covering a similar period. Substantial evidence in the record supports the Board's conclusion that the scope of access allowed by Facet did not satisfy the company's obligations under Truitt.[11]
 
 
 64
 C. Machinery Removal and Picketline Misconduct
 
 
 65
 In December 1983, Facet informed the Union that it had removed some manufacturing equipment from the Detroit plant and was contemplating moving other machinery as well. Picketing employees subsequently observed trucks removing what appeared to be machinery from the Detroit plant. Rec. vol. II at 1573. When Union negotiators requested information from Facet's counsel concerning this removed machinery, he confirmed that some work had temporarily been moved, but declined to provide any additional information. Id. vol. I at 377-78.
 
 
 66
 During a negotiating session held in January 1984, Facet informed the Union that the company intended to discipline employees who had engaged in picketline misconduct. Id. at 344-55. The Union inquired where the alleged misconduct took place and who was involved. Facet's negotiators stated that the company was still investigating the incident and could provide no detailed information. Evidence adduced at trial revealed that several of Facet's managerial employees had made oral and written reports of picketline misconduct as early as December 1983 and that the company had films and other documentation of the alleged misconduct. Nevertheless, despite the Union's repeated requests for information, the company provided no information until March 1984 when it gave the union copies of the telegrams sent to discharged employees. Id. vol. III at 2433. Finally, the following month, Facet provided the Union with a short memo describing the misconduct that led to the employees' dismissal. When asked for more information on these incidents, Facet's representatives told the Union that it "would see what [it] wanted at the NLRB hearings." Id. at 2434.
 
 
 67
 An employer's duty to disclose information to its employees' bargaining representative does not apply only to financial information; the employer also must provide all information "needed by the bargaining representative for the proper performance of its duties." NLRB v. Acme Indus. Co., 385 U.S. 432, 435-36, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967). A union is entitled to information relevant to its statutory and contractual obligation to administer a collective bargaining agreement. Safeway Stores v. NLRB, 691 F.2d 953, 956 (10th Cir.1982); see Lear Siegler, 890 F.2d at 1581.
 
 
 68
 The employer's obligation [to disclose information] is predicated upon the need of the union ... to provide intelligent representation of the employees. The test of the union's need for such information is simply a showing of probability that the desired information was relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities. The union need not demonstrate that the information sought is certainly relevant or clearly dispositive of the basic negotiating or arbitration issues between the parties. The fact that the information is of probable or potential relevance is sufficient to give rise to an obligation on the part of the employer to provide it.
 
 
 69
 The Washington Star, 273 NLRB 391, 396 (1984) (quoting Westinghouse Elec., 239 NLRB 106, 107 (1978)). However, the mere assertion by a union that it requires information to process a grievance does not, in itself, obligate an employer to provide the information in the precise manner requested. Detroit Edison v. NLRB, 440 U.S. 301, 314, 99 S.Ct. 1123, 1130, 59 L.Ed.2d 333 (1979). An employer therefore may deny a union relevant information where production is unduly burdensome or employer's interest in confidentiality outweighs union's interest in disclosure. Safeway Stores, 691 F.2d at 956.
 
 
 70
 Here, Facet's refusal to provide the Union with information concerning the removal of machinery is analogous to the facts presented to the Supreme Court in Acme, 385 U.S. at 434-435, 87 S.Ct. at 567. In Acme, the employer was obligated by a collective bargaining agreement to inform the union when it transferred work out of the plant. 385 U.S. at 433-34, 87 S.Ct. at 566-67. The company moved some machinery out of the plant and the union sought information on what was moved. The Supreme Court held that the information requested was relevant to the union's determination of whether to file a grievance for nonadherence to the terms of the agreement. Id. at 437, 87 S.Ct. at 568. Here, article XIX of the collective bargaining agreement between Facet and the Union provided that if the company elected to move a major portion of one plant, the affected workers could elect to be transferred to the new plant with full seniority. Facet Enter., unpub. order at 25-25 n. 2. Information concerning the machinery moved from the Detroit plant therefore was relevant to the Union's determination of how it would exercise its rights under article XIX of the agreement. Id.; The Washington Star, 273 NLRB at 396. Moreover, even if the Union did not wish to exercise its rights under article XIX, information concerning Facet's removal of equipment from the Detroit plant plainly was relevant to the Union's fulfillment of its representational obligation to preserve its members' jobs. See International Harvester, 241 NLRB 600, 604 (1979). Substantial evidence therefore supports the Board's holding that, by failing to provide the Union with information concerning the removed machinery, Facet violated its obligation under Sec. 8(a)(5).
 
 
 71
 Information concerning the discipline of Facet employees for picketline misconduct also plainly was relevant to the Union's representational obligations. See NLRB v. United States Postal Serv., 888 F.2d 1568, 1570 (11th Cir.1989); Anheuser Busch Inc., 237 NLRB 982, 984 (1970); see generally American Fed. of Gov. Employees v. FLRA, 793 F.2d 1360, 1364 (D.C.Cir.1986). Facet contends that it was not obligated to turn over such information because the events giving rise to the picketline misconduct were still under investigation. We agree that an employer's obligation to provide a union with information concerning the discipline of its employees is not unlimited and that certain safeguards may be instituted to protect informants and provide for a thorough investigation. In this case, however, the record contains substantial evidence that, by failing to provide the requested information, Facet was not motivated by a legitimate need to thoroughly investigate the alleged misconduct but rather acted disingenuously to preclude the Union from fulfilling its representational duties. The Board's finding that Facet's refusal to supply information concerning picketline misconduct violated Sec. 8(a)(5) therefore must stand.
 
 VII. Subsequent Violations
 
 72
 Facet finally challenges the Board's finding that it unilaterally modified conditions of employment after the strike without first bargaining to impasse with the Union. In the alternative, Facet contends that any such violations were de minimus in nature and hence unworthy of enforcement.
 
 
 73
 Pursuant to the master and local agreements of the 1980 contract, Facet was committed, inter alia, to the following contractual provisions: 1) a grievance procedure whereby complaints were initiated on prepared forms, 2) plant access for Union officials, 3) super-seniority for local union officers and shop committee members, 4) a specified number of paid hours for union representatives conducting labor-management business, and 5) six shop stewards at the Detroit plant. The ALJ heard evidence that Facet and the Union did not bargain to impasse on any of these provisions. Nevertheless, the record indicates that Facet unilaterally changed or eliminated the terms of these five provisions after the strike ended and the employees returned to work. Accordingly, we find substantial evidence in the record that Facet violated Sec. 8(a)(5) by unilaterally changing conditions of employment without first bargaining to impasse. See Howard Electrical, 909 F.2d at 1384. We are not convinced by Facet's argument that such violations were de minimus in nature. Although "de minimus, technical, or marginal violation[s] of the Act cannot properly support a broad, draconian remedy," Soule Glass & Glazing, 652 F.2d at 1114, we decline to place Facet's improper conduct with respect to such important areas of labor-management relations as grievance procedure, seniority and plant access within the minor category of violations falling under the de minimus exception, see, e.g., NLRB v. Styletek Div. of Pandel-Bradford, Inc., 520 F.2d 275, 282 (1st Cir.1975) (merely because unlawful interrogation of employees lasted only five minutes and involved only several employees did not make it a de minimus violation).
 
 
 74
 Enforcement of the Board's order is GRANTED, except as to its finding that the Detroit strike was converted from an economic to an unfair labor practice strike. We REMAND to the Board for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable David Sam, United States District Judge for the District of Utah, sitting by designation
 
 
 [1]
 The Board held:
 We ... note that although the complaint did not specifically allege a direct dealing violation, the complaint does challenge the legality of [Facet's] communications to the Detroit employees on the grounds that they constitute conduct designed to split apart the historic multiplant unit in violation of Section 8(a)(5). At the hearing, [Facet] had the opportunity to fully litigate the nature and extent of its communications to the Detroit employees. It is well established that the Board may find a violation, although not specifically alleged in the complaint, if it is related to the allegations in the complaint, the matter was fully and fairly litigated, and the respondent has not been prejudiced. Baytown Sun, 255 NLRB 154 fn. 1 (1981). That is the situation here.
 Facet Enterprises, slip op. at 5-6.
 
 
 [2]
 We do not reach the question of whether the Detroit, Madison Heights and Elmira plants constituted a single unit for purposes of collective bargaining because our review is limited to the Board's finding of direct dealing
 
 
 [3]
 Although there exists a presumption against multiplant units, once a multiplant unit is established, either through Board certification or the history of the bargaining relationship, the unit only may be altered upon the mutual agreement of the union and employer or upon an order by the Board. R. Gorman, Basic Text on Labor Law 76-77 (1976). An employer's refusal to bargain with a multiplant unit and insistence to impasse on a single plant unit therefore constitutes bad faith bargaining, a violation of Sec. 8(a)(5) of the Act, 29 U.S.C. Sec. 158(a)(5). See International Union of Elec. Radio and Machine Workers, 604 F.2d at 696
 
 
 [4]
 The record in this case comprises 3,975 pages of testimony held on various dates between February and October 1985. The ALJ displayed remarkable magnanimity in the face of the attorneys' obstreperous conduct; fully half the record is devoted to picayune objections and obstructionist squabbling between the attorneys. While we understand the parties' need to make a record, this conduct cluttered the record, needlessly complicating appellate review
 
 
 [5]
 During the General Counsel's opening argument, the following colloquy took place:
 JUDGE BERNARD: Are you saying that that is unlawful separate dealing or are you saying that that is refusing to bargain in good faith because it is an effort to improperly disintegrate or split the unit[?] ... Which are you saying?
 MR. HOWELL: --we are saying that both in essence. I meant the--there was some direct dealing where we believe improperly--
 JUDGE BERNARD: All right. You are saying both.
 MR. HOWELL: Both. And under the telltale circumstances it would be.
 Rec. vol. I at 17-18.
 
 
 [6]
 See rec. vol. I at 220-21, 233-34 (cross-examination of Lloyd Bastuba); id. vol. II at 1389-92 (cross-examination of Ilah Drake); id. at 1419 (cross-examination of Susan Hagerdorn); id. at 1448-49 (cross-examination of Mary Lewis); id. at 1492 (cross-examination of Sallie Dorman)
 
 
 [7]
 See rec. vol. I at 233-36 (cross-examination of Lloyd Bastuba); id. vol. II at 1392-94 (cross-examination of Ilah Drake); id. at 1419-20 (cross-examination of Susan Hagerdorn)
 
 
 [8]
 At oral argument, Facet contended that it would have called the company president James Malone had it known that the government was proceeding under a direct dealing theory. We are not convinced. Mr. Malone's testimony would have been equally relevant to the issue of unit-splitting as to direct dealing, yet Facet elected not to call him. Facet's decision thus appears more a result of trial strategy than lack of notice
 
 
 [9]
 An impasse exists when parties to a labor negotiation exhaust all possibility of reaching an agreement and further negotiations would be fruitless. Trustees of Col. Pipe Indus. Pension Trust v. Howard Elec. & Mechanical, Inc., 909 F.2d 1379, 1381 n. 2 (10th Cir.1990). Once a valid impasse is reached, an employer may take reasonable unilateral action without violating the Act. Id. at 1384
 
 
 [10]
 Facet contends that the Union's bargaining intransigence precludes a finding that Facet was responsible for converting the strike. However, irrespective of which side displayed greater intransigence in settling the strike, substantial evidence supports the Board's finding that Facet's unfair labor practice prolonged the strike at Elmira and Madison Heights. See Moore Business Forms, 574 F.2d at 840 (picketline misconduct by union did not preclude conversion finding where company's illegal discharge of striking employees prolonged strike). In the absence of a finding by the Board that the Union committed an unfair labor practice, we decline to consider this issue
 
 
 [11]
 Because we conclude that limiting access to a current financial statement precluded the Union from gaining a meaningful assessment of the Facet's ongoing economic viability, we need not reach the question of whether the gag order limiting disclosure of such information to the Union's representative ran afoul of Truitt. See, e.g., Metlox Mfg. v. NLRB, 378 F.2d 728, 730 (9th Cir.1967) (reasonable amount of elaboration and explanation of disclosed financial information necessary for union to fulfill its role as bargaining agent; limiting financial disclosure to simple "yes" or "no" by accountant as to accuracy of company's financial statement violates Sec. 8(a)(5))